# In The Matter Of:

*In Re: Vincent J. Fumo Irrevocable Children's Trust*

*Vol. I*
*July 9, 2013*

*John J. Kurz, CRR, Official Court Reporter*
*City of Philadelphia*
*First Judicial District Of Pennsylvania*
*100 South Broad Street, 2nd Floor*
*Philadelphia, PA 19110*

Original File 09JULY-2013-OKEEFE-FINISHED.txt
Min-U-Script® with Word Index

**Exhibit**
R

```
 1              - JANE SCACCETTI - DIRECT -
 2                 (Witness took the stand.)
 3              COURT CRIER:  Please raise your right
 4        hand.
 5                         - - -
 6              ... JANE SCACCETTI, after having been
 7        first duly sworn, was examined and testified
 8        as follows:
 9                         - - -
10              COURT CRIER:  Please state and spell
11        your name for the Court.
12              THE WITNESS:  My name is Jane
13        Scaccetti, S-C-A-C-C-E-T-T-I.
14                         - - -
15                    DIRECT EXAMINATION
16                         - - -
17   BY MR. FOSTER:
18   Q.   Ms. Scaccetti, good afternoon.
19              Could you identify your relationship
20   with the Settlor, Vincent J. Fumo?
21   A.   He's my ex-husband and the father of my
22   daughter.
23   Q.   So you are the mother of Allison?
24   A.   Yes.
25   Q.   What do you do for a living?
```

```
 1                - JANE SCACCETTI - DIRECT -
 2   A.     I'm a CPA.  I specialize in taxation.
 3   Q.     There's been testimony today that a Trust and
 4   a Family Limited Partnership were created by your
 5   ex-husband on June 23, 2006.  Was he your ex-husband
 6   by that time?
 7   A.     Yes.
 8   Q.     Were you speaking?
 9   A.     Yes, in 2006, yes.
10   Q.     Did you have any discussions with Mr. Fumo
11   about his purpose, why it was that he was creating
12   the Trust and the Family Limited Partnership?
13   A.     Yeah.  He -- the -- he anticipated that at
14   some point he would sell Pennsylvania Savings Bank,
15   which was his grandfather's bank.  Fumo Savings and
16   Loan it was originally.  And he felt that the time
17   was coming where small community banks would get
18   gobbled up by bigger banks and he said that he
19   wanted to set aside money for his children because
20   it was a legacy from his grandfather.
21   Q.     Did you ever discuss with him, providing him
22   with any assistance in the administration or
23   finances of the Limited Partnership?
24   A.     In 2010, I was made aware, I think, from
25   Vincent, that distributions had occurred and people
```

```
 1                  - JANE SCACCETTI - DIRECT -
 2   were loosely using the terms FLP and Trust.  And
 3   Vincent had turned 40 and he said that he was not --
 4   that the Trust document read that he could take his
 5   distributions.  And Allie had told me that Vince had
 6   borrowed money from the Trust back in, I guess it
 7   was, late '09, before he went into prison.  And I
 8   wrote to Vince and I asked him if they were honoring
 9   the distributions to be equal between the children;
10   and, again, I did not really understand the
11   structure, so I didn't know if it was the FLP or the
12   Trust.  I didn't have any visibility to what was
13   being funded.
14                  And I said that -- I think in my
15   letter I said something like if Vincent takes the
16   cash and Allie gets the note, you've disenfranchised
17   one partner versus the other.  And Vince wrote back
18   letters explaining how this worked.
19   Q.   Could you turn to the exhibit book?
20   A.   I have to get my papers.
21   Q.   They are in the book in front of you.
22   A.   Oh, okay.  Got it.
23   Q.   If you turn to Tab 48, and Exhibit AF-48.
24   A.   Forty-eight?
25   Q.   Forty-eight.
```

```
 1                - JANE SCACCETTI - DIRECT -
 2              MR. FUMO:  There is no 48 tab, but
 3        they're there.
 4              THE WITNESS:  Oh, I got it.
 5   BY MR. FOSTER:
 6   Q.    Do you recognize the document that's been
 7   marked as Exhibit 48?
 8   A.    I do.  Page 1 seems to be missing from it.
 9   Q.    Let me --
10              THE COURT:  Do you have any --
11              THE WITNESS:  It would be Page 1 from
12        the October letter.
13              THE COURT:  Actually, I found -- the
14        book that I have doesn't have it.  We have a
15        tab, but there's nothing here.  But counsel
16        has it in his book, so I guess it's in his.
17              MR. FOSTER:  I apologize, Your Honor,
18        with the assembly of ten of these books.
19              THE COURT:  Does she have it in her
20        book?
21              MR. FOSTER:  I have another book here
22        with a complete set.
23              THE COURT:  Okay.
24              MR. FOSTER:  Is Your Honor missing
25        the 48, 49 and --
```

```
 1                  - JANE SCACCETTI - DIRECT -
 2              THE COURT:  Okay.  Forty-eight.
 3              MR. FOSTER:  49 and 50 as well.
 4              THE COURT:  Yes.  Yeah.
 5              MR. FOSTER:  Because we have one.  We
 6       have a set here.
 7              THE COURT:  You know what, I'll
 8       switch books with you.
 9              Thank you.
10              THE WITNESS:  I have two 49s.  I
11       don't know if you want to correct this later.
12              THE COURT:  All right.  We're on 48.
13              MR. FOSTER:  Okay.
14              THE WITNESS:  Okay.
15   BY MR. FOSTER:
16   Q.    Do you recognize what we have marked as
17   Exhibit 48?
18   A.    Yes.  It's a letter Vince sent to me that he
19   has dated September 17th.  I probably got it shortly
20   after that.
21   Q.    Do you recognize the handwriting as being the
22   handwriting of your ex-husband?
23   A.    Yes.
24   Q.    Could you generally -- we're going to work our
25   way through this, but could you just generally
```

```
 1                - JANE SCACCETTI - DIRECT -
 2    summarize the content and then we're going to deal
 3    with some specifics.
 4    A.    It just started, we -- I had sent him some
 5    articles to read and he was saying what he enjoyed
 6    and what books he's read and we talked about Allie
 7    and the progress that she was making in school; and
 8    then he turned, on Page 2, as to her finances,
 9    here's what I understand.  It's Page 2, two
10    paragraphs from the bottom.
11    Q.    And could you read what is written here
12    through the balance of the page?
13    A.    He says, "The FLP has two assets.
14    Approximately 650,000 in cash, plus an approximate
15    $1.4 million loan to me for my fines and
16    restitutions, secured by Green Street.
17              "Vincent is truly trying to get me to
18    get a loan from a bank for the 1.4 million so he can
19    cash out of the FLP.  But given the economy and my
20    situation, this is not feasible and too costly.  The
21    best they were able to do was a 5" -- I think it
22    says -- "four-eighths or seven-eighths interest-only
23    loan with a $32,000 placement fee.  That won't work.
24    If I'm going to pay interest, I might as well pay it
25    to the FLP.
```

1                – JANE SCACCETTI – DIRECT –
2              "Currently Vincent has already gotten
3    about 370,000 in distributions, so Allie's Trust is
4    entitled to a like amount.  This could easily come
5    from the approximately 650,000 in cash."
6    Q.    Let me stop you there.
7              In September of 2010, did you have
8    any understanding as to what the status was of the
9    $1.4 million loan from the partnership to your
10   ex-husband?
11   A.    No.  I just knew there was a loan.  I don't
12   think I had any clarity.
13   Q.    There's been testimony earlier today in the
14   courtroom that there was a renegotiation of that
15   loan around October of 2010.  And my question for
16   you specifically is:  Did you know anything about
17   what was going on with regard to any negotiations or
18   modifications of the loan?
19   A.    No, nothing about modifications.
20              The only time -- my best recollection
21   that I found out any of that is in the letters Vince
22   sent to me.
23   Q.    Now, I think he goes on to share his views as
24   to how the finances should be organized.
25   A.    Yes.  He says that "there could be another

- JANE SCACCETTI - DIRECT -

distribution of 125,000 to Vincent and another 125,000 to Allie's Trust.  This would leave some dollars for operating expense, et cetera."  And then he says, "I am paying over 60,000 in interest a year, so there could be another..."

Q.    Is that annual distribution?

A.    "Annual" -- thank you -- "annual distributions of the after-tax dollars to Vincent and Allie's Trust."  And then he goes -- do you want me --

Q.    Yes.  I think there's some discussion on the next page and I think it's important for us to read into the record, given your ability to read his handwriting versus ours.

A.    He says, "Being in here is very difficult to get things done.  I have to rely on 'snail mail' and others like Andy, so it takes forever.  If you would be willing to help get" -- and quote, I'm quoting -- "get shit done regarding these issues, I would greatly appreciate it.  And it would help protect Allie's interests.

"As to the million dollar policy" -- there was a million dollar life policy that he had that he took out when I had Allie and I had asked if that was still intact.  So he's responding to that

```
 1                - JANE SCACCETTI - DIRECT -
 2   request and he says, "As to the million dollar
 3   policy, I've sold it along with almost all of my
 4   investment real estate to pay legal bills," sad
 5   face.
 6                "I don't think this was irresponsible
 7   since I had set up and funded the FLP and Allie's
 8   Trust.  As you know" --
 9   Q.    Now, let me interrupt you there.
10                Do I understand what your ex-husband
11   is saying is that he had spent the money, the
12   proceeds from a life insurance policy that he had
13   bought for the benefit of his daughter, Allison, but
14   he felt justified in doing so because he funded
15   these Trusts?
16   A.    That's how I read it.
17   Q.    Okay.
18   A.    "As you know, I am broke and still take the
19   possibility" -- "and still face" -- sorry -- "the
20   possibility of more litigation regarding my" -- I'm
21   sorry, something "et cetera."  "Regarding my" -- I
22   don't know what it says, unless somebody else does.
23                MR. WEIR:  "Sentence."
24   BY MR. FOSTER:
25   Q.    Would that be "sentence"?
```

```
 1                  - JANE SCACCETTI - DIRECT -
 2   A.     "Sentence," yes, could be.  "All I have
 3   basically left is my real estate which -- my real
 4   estate which is stuck in this economy," sad face.
 5   Q.     Let me interrupt you there.
 6                  This letter was being written -- or
 7   was written in September 17 of 2010.  His reference
 8   to being broke, would that a fair characterization
 9   that that was a significant change in his financial
10   circumstances from June of 2006 when he created the
11   Trust and the Family Limited Partnership?
12   A.     According to him, yes.
13   Q.     And what about according to your knowledge of
14   his finances?
15   A.     Well, he had tremendous legal fees that he was
16   paying.  He paid restitution.  They were counted by
17   the millions of dollars.  I guess it's all relative,
18   but that seemed like a lot of money.
19   Q.     But insofar as comparing his financial
20   situation in September of 2010 to what it had been
21   back in June of 2006, would it be a fair
22   characterization that there had been a substantial
23   change in his financial condition?
24   A.     Substantial.  Clearly his earning capacity.
25   He couldn't practice law.  He was no longer a
```

```
 1                - JANE SCACCETTI - DIRECT -
 2   senator.  He lost his retirement income.
 3   Q.    Now, if you take a look at the final page of
 4   this exhibit, second to last paragraph, am I
 5   reading -- do I read this correctly:  "Please write
 6   and let me know if you will help out with the FLP"?
 7   A.    Correct.
 8   Q.    And did you write?
 9   A.    I think I did.  I'm pretty certain I did,
10   because there's another letter from him in October
11   going over all of the facts.
12   Q.    Did you try to help?
13   A.    By the time I got the October letter and I had
14   a little more information, because I didn't know
15   what to help with at that stage.
16   Q.    Could you identify, for the record, what's
17   been marked as Exhibit AF-49, under Tab 49 in this
18   book?
19   A.    It's a letter to me from Vince dated
20   October 24, 2010.  Again, I probably received it a
21   few days later.
22   Q.    Now, is there any discussion within this
23   letter about the finances of the FLP with reference
24   to Allie's Trust?
25   A.    By the way, he says opening that "thank you
```

Case 2:13-cv-03313-RB   Document 9-27   Filed 09/10/13   Page 13 of 17

264

```
 1                - JANE SCACCETTI - DIRECT -
 2   for my letter of October 15th," so I did write back
 3   to him.
 4              He does.  He says in the third
 5   paragraph, "As to the FLP and Allie's Trust, I am
 6   still confused and not sure that my wishes are being
 7   carried out.  This is why I asked you to get
 8   involved.  Andy always says that everything is fine
 9   and under control and then I find out later that it
10   is not.  I am at his and many others' mercy in here,
11   so I have to tread carefully.  I never paid
12   attention to the details of all this stuff when I
13   was on the outside because I always had someone who
14   was competent to take care of the details, but now
15   it's different," sad face.
16   Q.    Let's then skip forward a couple of paragraphs
17   to the paragraph on the next page that begins with
18   "so I need you..."
19   A.    "So I need you to make sure that all of this
20   is -- all the Is are dotted" -- sorry -- "so I need
21   you to make sure that all of the Is are dotted and
22   the Ts crossed, if you will."
23   Q.    And then skip -- the next paragraph I don't
24   believe is particularly germane, but if you could
25   then skip to the paragraph that begins "in short,
```

John J. Kurz, CRR, Official Court Reporter
Phone 215-683-8035  Fax 215-683-8005

```
 1                - JANE SCACCETTI - DIRECT -
 2   however," could you read that?
 3   A.    Yeah.  "In short, however, this is what I want
 4   accomplished.  The FLP has lent me about a million,
 5   four to pay off my fines and restitutions, which I
 6   have done.  The terms were supposed to be
 7   interest-only payments at a little less than
 8   4 percent, whatever the legal" -- "legal percent is,
 9   for the first five years, and then the loan would be
10   amortized over 25 years down -- over 25 years from
11   that point.  All payments going into the FLP."
12                Second, "The loan is to be secured by
13   a mortgage -- mortgages against Green Street and 108
14   South Kenyon Avenue."
15   Q.    Now, this letter was on October 24, 2010?
16   A.    Right.  And this is what he says he wants
17   accomplished.
18   Q.    A mortgage on both properties?
19   A.    Correct.
20                It says, "The loan is to be secured
21   by a mortgage against Green Street and 108 South
22   Kenyon Avenue."
23                Third point, "The Green Street
24   mortgage is to be subordinate to a $250,000 note,
25   also secured by Green Street from me to Carolyn.
```

1                  - JANE SCACCETTI - DIRECT -
2    This is for the almost 260,000 that she put up to
3    pay off the -- something of the Estate of Steve
4    Marcus that was in first position."
5    Q.    Now, I think the others are details with
6    regard to the terms of the note and the loan, and
7    we've heard a lot of discussion about that already.
8    I do want to focus on, just moving along, focus on
9    the next page, Page 4.
10   A.    Page 4, he wrote at the top, "Note:  My goal
11   is to become as judgment-proof as possible.  I want
12   to, quote, "own nothing but control everything," end
13   quote, happy face.
14   Q.    Could you read the next paragraph?
15   A.    "I never want to be this vulnerable to the
16   government or any conditions again in my life."
17   Q.    Is that "creditors" or "conditions"?
18   A.    Oh, creditors.  Sorry.  Thank you.  It's
19   "creditors."  "Again in my life.  These fines and
20   restitutions were a grossly unfair outrage," sad
21   face.
22   Q.    Paragraph 6, what does he say there?
23   A.    "There was supposed to be about $650,000 in
24   cash in the FLP.  This is to be divided equally
25   among the shareholders, Allie, Vincent and me.  But

```
 1                  - JANE SCACCETTI - DIRECT -
 2   my share is only .6 percent or so.  The rest is
 3   split evenly between Vincent and Allie's Trust."
 4             Paragraph 7 says, "Vincent has
 5   already received a distribution of about 630,000 of
 6   the 650,000.  Allie's Trust to receive an equal
 7   amount first, then the balance is to be distributed
 8   proportionately.  Plus I wanted to keep about 50,000
 9   to 25,000 in cash in the FLP for expenses and cash
10   flow."
11   Q.   Did he -- and I think that concludes what we
12   need to cover with regard to this letter, but did
13   you receive another letter from your ex-husband on
14   the same day?
15   A.   Well, what it says is, if you look at that
16   letter we were just reading from, he says that he'd
17   rather I not show this to Andy so that he would give
18   me another letter that I could show to Andy that
19   would give authority to ask the questions.
20   Q.   And what you were just referring to is
21   actually the last paragraph of Exhibit 49.
22   A.   Well, actually, second to the last paragraph,
23   because there's a little PS.
24   Q.   Okay.  Now -- and is Exhibit AF-50, under Tab
25   50, that "sanitized" letter that he's referring to?
```

```
 1                - JANE SCACCETTI - DIRECT -
 2    A.    Yes.
 3    Q.    Have you ever had any communications or
 4    contact with either Rosanne Pauciello or Sam Bennett
 5    on any matter involving either the Trust or the
 6    Family Limited Partnership?
 7    A.    No.
 8    Q.    Do you know Mitchell Rubin?
 9    A.    I do.
10    Q.    Have you ever had any communications with
11    Mitchell Rubin about any matter involving either the
12    Trust or the Family Limited Partnership?
13    A.    Yes.
14    Q.    Could you -- and what was the nature of that
15    communication?  Starting with when.
16    A.    So it was in the fall of 2011 -- and I had
17    double-knee replacement surgery in November of 2011,
18    so it's before that -- I received a phone call from
19    Mitchell and Mitchell said that Rosanne Pauciello
20    was the Trustee for Allie's Trust and that to the
21    best of his knowledge, nothing had ever been done on
22    behalf of Allie's Trust.  He said that he thought
23    that Allie was a good kid and that someone should be
24    looking out for her interests and that he was the
25    Successor Trustee and that he would be refusing that
```