**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VINCENT J. FUMO, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | NO.    13-3313 |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                                      June 5, 2014

      Currently pending before the Court are the Cross-Motions for Summary Judgment by

Plaintiff Vincent J. Fumo ("Plaintiff") and by Defendant United States of America

("Defendant").  Also pending before the Court is Defendant's Motion to Exclude Expert

Testimony.  For the following reasons, Defendant's Motion to Exclude Expert Testimony and

Defendant's Motion for Summary Judgment are denied.  Plaintiff's Motion for Summary

Judgment is granted.  The jeopardy assessment made against Plaintiff shall be abated, and all

liens and levies filed pursuant to it shall be released.  Plaintiff's request for attorney's fees and

costs is denied.

**I.       FACTUAL HISTORY[1]**

      **A.       Plaintiff's Criminal Convictions**

      Plaintiff, a former Pennsylvania State Senator, was indicted in February 2007 and, on

March 16, 2009, was convicted of one hundred thirty-seven counts of conspiracy, fraud,

---

[1] **The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs. To the extent the parties allege a fact that is unsupported by evidence, the Court does not include it in the recitation of facts.**

obstruction of justice, and aiding and abetting the filing of false tax returns of a tax-exempt organization.[2]  Plaintiff was ultimately sentenced to sixty-one months in prison and thus far has been ordered to pay in excess of $3.5 million in restitution.  (Compl. ¶ 17.)  To date, Plaintiff has paid nearly $4 million to the United States in fines, restitution, and assessments in connection with his criminal convictions.  (Compl. ¶ 23.)  Plaintiff began serving his prison sentence on August 31, 2009 and, on August 2, 2013, was released from the Federal Prison Camp in Ashland, Kentucky to serve the rest of his sentence under home confinement.  (Compl. ¶ 83; Pl.'s Mem. Opp. Def.'s Mot. Summ. J., Ex. A, Declaration of Vincent J. Fumo, Nov. 11, 2013 ("Fumo Decl.") ¶ 2.)  Plaintiff's sentence as to home confinement expired on February 2, 2014. (Fumo Decl. ¶ 2.)  He is presently on supervised release.

The Internal Revenue Service ("IRS") assigned Revenue Agent Kenneth J. Kelly ("Agent Kelly") to investigate whether any of the evidence presented at Plaintiff's criminal trial had any income tax implications.  (Def.'s Mot. Summ. J., App'x, Declaration of Agent Kelly ("Kelly Decl."), Sept. 5, 2013, ¶ 5.)  Agent Kelly sent Plaintiff a letter in 2009 informing him of the investigation.  (Id. ¶ 6.)  From 2009 to 2012, Agent Kelly reviewed the transcripts and all relevant trial exhibits from Plaintiff's four-month long criminal trial.  (Id. ¶ 7.)  Agent Kelly noted in his Declaration that "[t]he examination was delayed at times" because he took time off to deal with serious family issues.  (Id. ¶ 7 n.1.)  From the evidence Agent Kelly reviewed, the IRS determined that Plaintiff owed additional income tax for the 2001–2005 tax years.  (Id. ¶ 8.)

**B.       The Notice of Proposed Adjustments and the Jeopardy Assessment**

---

[2] That case is docketed before the United States District Court for the Eastern District of Pennsylvania at United States v. Vincent J. Fumo, Criminal No. 06-0319.

On October 3, 2012, the IRS mailed a notice to Plaintiff proposing the following adjustments to his income tax liability for the 2001–2005 tax years:

| Tax Year | Tax | Penalty | Interest (As of October 3, 2012) |
|---|---|---|---|
| 2001 | $217,225.00 | $162,918.75 | $280,701.19 |
| 2002 | $208,295.00 | $156,221.25 | $233,981.11 |
| 2003 | $164,943.00 | $123,591.00 | $164,322.96 |
| 2004 | $88,006.00 | $66,004.50 | $76,428.72 |
| 2005 | $67,905.00 | $50,349.75 | $47,484.59 |

(Id. ¶ 9.)

According to Agent Kelly, "the IRS learned, through a newspaper article, that the taxpayer had effectively disposed of most of his real property interests," which "prompted the IRS to evaluate whether a jeopardy assessment should be made against [Plaintiff]." (Id. ¶¶ 10–11.) Agent Kelly was personally involved in the investigation. (Id. ¶ 12.) On March 21, 2013, the IRS issued to Plaintiff a Notice of Jeopardy Assessment and Levy and Right of Appeal due to alleged unpaid income tax liabilities for the years 2001–2005. (Id. ¶ 13.)

The newspaper article, which appeared in the Philadelphia Inquirer on October 21, 2012, describes the Government's efforts to have Plaintiff pay an additional $800,000 in restitution instead of Plaintiff's codefendant in the criminal trial, Ruth Arnao.[3] (See Def.'s Mot. Summ. J., Ex. F, Craig R. McCoy and Miriam Hill, *Fumo shifts property ownership, keeps quarreling*, Phila. Inquirer, Oct. 21, 2012, at A01.) The article describes, among other topics, Plaintiff's resistance to paying the increased share of restitution, the real estate transactions detailed in the IRS declarations, and Plaintiff's claims that he transferred properties to avoid the impending

---

[3] At a hearing on May 20, 2014, Plaintiff was directed to pay 75% rather than 50% of restitution.

3

increase in federal gift taxes scheduled to take effect the following January.  (See id.)  The article quotes federal prosecutors who have promised to collect any additionally-ordered restitution "either from the fiancée's windfall or from the many other assets owned by Fumo."  Id.  The article added that "[t]he IRS is looking at having Fumo pay for illegal benefits he reaped from his frauds, sources say."  Id.

Through its investigation of Plaintiff, the IRS determined that transfers of real property that Plaintiff made beginning in 2008, discussed in more detail below, diminished his overall net worth and his equity in those properties.  (Def.'s Mot. Summ. J., App'x, Declaration of IRS Revenue Officer Marvena Lewis ("Lewis Decl."), ¶ 11.)  The IRS was also concerned about the impact Plaintiff's age could have on tax collection efforts, because he is seventy years old and, upon his death, six of the properties described below would be wholly owned either by Plaintiff's son or by his fiancée.  (Id. ¶ 12.)

IRS Revenue Officer Marvena Lewis ("Officer Lewis") investigated whether Plaintiff had other outstanding assets aside from real property that could be used to satisfy the assessed income, gift, and excise taxes.  (Id. ¶¶ 13–14.)  Through that investigation, Officer Lewis located a retirement account at United Savings Bank, as well as several other bank accounts and related operating accounts in Plaintiff's name.  (Id.)  Because a formal tax assessment had not been made at the time of Officer Lewis's investigation, the IRS was unable to serve a summons on any of the banks to determine the exact amount of money in the accounts.  (Id. ¶ 14 n.2.)  In the spring of 2012, prior to Officer Lewis's involvement in the investigation, Plaintiff was still

incarcerated and had lost his license to practice law,[4] which the IRS believed jeopardized tax

collection.  (Id. ¶ 15.)

On March 21, 2013, in accordance with 26 U.S.C. § 6861(a),[5] the IRS issued Notices of

Jeopardy Assessment and Levy and Right of Appeal to Plaintiff due to his unpaid income tax

liabilities for tax years 2001 through 2005, his unpaid excise tax liabilities for tax years 2002

through 2004, and unpaid gift tax liabilities for tax year 2009.  (Id. ¶¶ 17–20.)  Plaintiff, through

counsel, requested review/redetermination of the jeopardy assessments on April 17, 2013,

pursuant to 26 U.S.C. § 7429(a).[6]  (Compl. ¶ 4e.)  In addition, Plaintiff, through counsel, sought

review of, and a Collection Due Process hearing concerning, the Notices of Jeopardy Levy on

April 18, 2013, also pursuant to 26 U.S.C. § 7429(a).  (Id. ¶ 4f.)  Since Plaintiff disputes the

amounts assessed, and therefore did not pay after notice and demand, the IRS acted to preserve

its interest in Plaintiff's real properties by filing notices of federal tax liens against all the real

properties jointly owned by Plaintiff and his son and by Plaintiff and his fiancée, and by filing

notices of federal tax liens against Plaintiff's son and Plaintiff's fiancée as nominees of Plaintiff.

(Lewis Decl. ¶ 21.)  On May 21, 2013, the IRS issued jeopardy levies to United Savings Bank,

Fidelity Investments, Beneficial Bank, Vanguard Group Inc., Invesco Powershares Capital

Management LLC, and National Financial Services LLC, because it reasonably believed

---

[4] On April 24, 2014, the Supreme Court of Pennsylvania accepted Plaintiff's resignation from the Bar of the Commonwealth of Pennsylvania and ordered that he be disbarred retroactive to January 26, 2010.  Office of Disciplinary Counsel v. Vincent Fumo, No. 1535 Disciplinary Docket No. 3 (Pa. Apr. 24, 2014) (per curiam).

[5] "If the Secretary believes that the assessment or collection of a deficiency, as defined in section 6211, will be jeopardized by delay, he shall, notwithstanding the provisions of section 6213(a), immediately assess such deficiency (together with all interest, additional amounts, and additions to the tax provided for by law), and notice and demand shall be made by the Secretary for the payment thereof."  26 U.S.C. § 6861(a).

[6] "Within 30 days after the day on which the taxpayer is furnished the written statement described in paragraph (1), or within 30 days after the last day of the period within which such statement is required to be furnished, the taxpayer may request the Secretary to review the action taken."  26 U.S.C. § 7429(a)(2).

Plaintiff had accounts with those entities.  (Id. ¶ 22.)  The IRS gave Plaintiff written notice of the

jeopardy levies as required by the Internal Revenue Code, and on May 7, 2013, asked United

Savings Bank, Fidelity Investments, and Beneficial Bank to continue holding the levied funds

until further notice.  (Id. ¶¶ 23, 25.)  Due to the jeopardy levies, United Savings Bank is holding

approximately $2.7 million of Plaintiff's money, Fidelity Investments is holding approximately

$17,000 of Plaintiff's money, and Beneficial Bank is holding approximately $60,436.58 of

Plaintiff's money.  (Id. ¶ 24.)  Plaintiff also has additional bank accounts other than those levied

by the IRS.  (Hr'g on Cross-Mots. for Summ. J. Tr., 12:12–21, Mar. 18, 2014.)

### C.      The Income Tax Assessment and the Fraud Penalty Assessment

In the jeopardy assessment, the IRS assessed Plaintiff with additional income tax,

penalties, and interest for tax years 2001–2005, as follows:

| Tax Year | Tax | Penalty | Interest (As of March 21, 2013) |
|---|---|---|---|
| 2001 | $217,225.00 | $162,918.75 | $288,230.46 |
| 2002 | $208,295.00 | $156,221.25 | $240,800.03 |
| 2003 | $164,705.85 | $123,529.37 | $169,307.00 |
| 2004 | $88,006.00 | $66,004.50 | $79,054.20 |
| 2005 | $67,905.00 | $50,928.75 | $49,614.64 |

(Kelly Decl. ¶ 14.)

The IRS also assessed Plaintiff with a fraud penalty for tax years 2001–2005, based on

the following "facts currently known, among other reasons":  (1) Plaintiff [was] a licensed

attorney and a sophisticated professional; (2) Plaintiff substantially understated his income

between 2001 and 2005; (3) Plaintiff was convicted of 137 counts of wire and mail fraud,

obstruction of justice, conspiracy, and tax violations for using state employees and consultants

for political and personal purposes, defrauding the state of Pennsylvania and two nonprofit groups of approximately $3.5 million between 2001 and 2005, and aiding in the filing of false tax returns by Plaintiff's tax-exempt organization, Citizens Alliance for Better Neighborhoods ("CABN" or "Citizens Alliance"); (4) Plaintiff attempted to conceal his illegal activities, for example by directing staff members of Citizens Alliance to destroy records relating to Plaintiff's fraudulent activity relating to Citizens Alliance; (5) Plaintiff did not keep adequate records detailing the income and benefits he received from the state of Pennsylvania and the non-profit groups; and (6) Plaintiff failed to report the taxable income and benefits he received from the state of Pennsylvania and the two non-profit groups.  (Id. ¶¶ 16–17.)

Plaintiff asserts that if it is ultimately determined that he failed to report income, it was unintentional and "resulted from [his] lack of appreciation that the losses resulting from the conduct underlying [his] conviction constituted income to [him] if, in fact, they did constitute income." (Fumo Decl. ¶ 6b.)  Plaintiff states that he did not believe that the conduct underlying his criminal case carried any tax implications, particularly because "the Criminal Investigation Division of the IRS was deeply involved in the investigation and prosecution of [his] case, yet no personal income tax counts were made part of the Indictment," even though "[g]iven the prohibitively large number of counts (137), a few more would not have been significant."  (Id. ¶ 6c.)  Plaintiff maintains that he is not sophisticated in tax matters, and did not believe he was required to keep records of conduct resulting in losses to others, or resulting in benefits to him, because he did not know or believe such conduct could have tax implications for his personal taxes.  (Id. ¶¶ 6a, 6d.)

### D.    The Gift Tax Assessment

IRS Lead Attorney Alice Diamond ("Diamond") worked on the jeopardy assessment against Plaintiff and reviewed "confidential information" to determine whether any of Plaintiff's cash transfers had gift tax implications.[7]  (Def.'s Mot. Summ. J., App'x, Declaration of Alice Diamond ("Diamond Decl."), Sept. 5, 2013, ¶ 12.)  As part of the jeopardy assessment, Plaintiff was assessed with $327,895.00 in unpaid gift tax liabilities for the 2009 tax year, as well as $132,798.00 in additions to tax under section 6651(a) of the Internal Revenue Code for failure to timely file a United States Gift (and Generation-Skipping Transfer) Tax Return (Form 709) ("gift tax return") in 2009 and for failure to timely pay the gift tax.  (Id. ¶¶ 4–5.)

The IRS based the gift tax deficiency and additions to tax on "confidential information" it received regarding a series of large fund transfers between accounts held by Plaintiff and his son, Vincent E. Fumo, II, at several banks and financial institutions.  (Id. ¶ 9.)  The total amount involved in the transfers is $2,793,500.00.  (Id. ¶ 10.)  The IRS claims that the movement of funds "is suspicious and appears to be designed to hide the original source of the money."  (Id. ¶ 11.)  The Narrative to the Jeopardy Assessment against Plaintiff states that "[t]he Service received information" regarding the transfers from Plaintiff to his son that were made for "no known purpose."  (Def.'s Mot. Summ. J., App'x Ex. A.)  The Narrative also states that

> [A]lmost immediately after his conviction in 2009, information was provided to the Service that established that Fumo transferred a total of $920,000 from a bank account he held jointly with his son to an account held solely in his son's name.  Based upon (1) the inequality in their known income and wealth; (2) the use of the joint account to pay Fumo's criminal defense attorney fees; and (3) the known deposits in to [sic] the account being solely attributable to Fumo, the Service concluded that the $920,000 cash transfer to his son's account is a taxable gift.

---

[7] Pursuant to 26 U.S.C. § 2501, a gift tax is imposed on the transfer of property by gift by any individual.  A gift is a transfer for less than full value.  26 U.S.C. § 2512.  The tax arises whether the donor intends the transfer to be a gift or not.  26 C.F.R. § 25.2511-1(g)(1).  A gift is complete when the taxpayer has "so parted with dominion and control as to leave in him no power to change its dominion."  26 C.F.R. § 25.211-2.

(Id.)

After reviewing the "confidential information" Diamond determined that the following

transfers, totaling $920,000, qualified as "gifts" under 26 U.S.C. § 2501:

> (1) A transfer of $500,000 from a bank account held jointly by
> Plaintiff and his son to an account held solely in Plaintiff's
> son's name, which occurred on August 19, 2009.
> (2) A transfer of $250,000 from the same joint bank account to an
> account held solely in Plaintiff's son's name, which occurred
> on September 2, 2009.
> (3) A transfer of $100,000 from the same joint bank account to an
> account held solely in Plaintiff's son's name, which occurred
> on September 10, 2009.
> (4) A transfer of $70,000 from the same joint bank account to an
> account held solely in Plaintiff's son's name, which occurred
> on October 5, 2009.

(Id. ¶¶ 14–15.)  Diamond based her determination on the following factors:  (1) the $920,000

originated from Plaintiff, who either directly deposited the funds into the joint account, or where

other individuals deposited checks made payable to Plaintiff into the joint account; (2) the

$920,000 was transferred to a bank account in Plaintiff's son's name; and (3) after the transfer,

"[Plaintiff] ceased all dominion or control over the $920,000.  He had no ability to withdraw the

$920,000 from his son's account or to control how the money was used.  Moreover, the

Service's confidential information confirms that [Plaintiff's son] utilized some of the funds from

this account to purchase a parcel of real estate for himself."  (Id. ¶ 16.)

Prior to the start of Plaintiff's prison sentence, he arranged for other people to manage his

financial affairs during his incarceration, including his retirement fund and cash accounts, and

bill payments for, and management of, several personal and investment properties, including

rental properties.  (Fumo Decl. ¶ 5a.)  Plaintiff's son agreed to manage Plaintiff's financial

affairs pursuant to a General Power of Attorney, shared with Plaintiff's friend Thomas Myers,

which allowed Plaintiff's son to act on his behalf in all matters, but did not allow Plaintiff's son to make gifts to himself or anyone else.  (Id. ¶ 5b–c.)  Shortly before Plaintiff commenced serving his prison sentence, he and his son opened a joint bank account through which Plaintiff's son would manage his affairs.  (Id. ¶ 5d.)  Plaintiff added his son as a joint signer on some of his already existing bank accounts.  (Compl. ¶ 85.)  Plaintiff disagrees with statements in the Diamond Declaration which assert that he gave up control of the funds, because "[a]lthough as a prisoner [he] could not directly conduct any financial affairs, [he] did maintain some degree of control over the assets through discussions with [his] son."  (Fumo Decl. ¶ 5h.)  Plaintiff maintains that the money transfers Diamond relied on were not gifts, but were part of Plaintiff's son's management of Plaintiff's financial affairs pursuant to the Power of Attorney.  (Id. ¶ 5e–f.)  According to Plaintiff, his son asked if he could borrow money from the funds, and after Plaintiff agreed to loan his son the money, it was repaid within the same year.  (Id. ¶ 5g.)  Plaintiff's son "regularly paid multiple utility bills, insurance bills, and property maintenance bills associated with the management of rental properties and other real estate owned by [Plaintiff], as well as credit cards, legal bills, boat expenses, etc.," in addition to paying significant funds to the United States Government on Plaintiff's behalf.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J., Ex. B, Declaration of Vincent E. Fumo, II, ("Fumo II Decl."), ¶¶ 20, 25.)  Plaintiff's son caused funds to be transferred between Plaintiff's numerous bank accounts to facilitate the management of his father's affairs, and eventually after January 2010 he consolidated those accounts into three main accounts from which he managed Plaintiff's affairs until late 2012 when he was relieved of those responsibilities.  (Id. ¶¶ 22-23.)

Plaintiff's son, Vincent E. Fumo, II, maintains that while Diamond does not identify the banks at which the accounts at issue here were held, he believes that she refers to transfers

between a joint account at Citizens Bank into an account at ING Direct which was in his name only.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J., Ex. B, Second Supp. Decl. of Vincent E. Fumo, II, Nov. 7, 2013 ("Fumo II Second Supp. Decl."), ¶ 6b–c.)  Plaintiff's son does not dispute the dates or the amounts of the transfers, but adds that the funds transferred into the ING Direct account were ultimately transferred back into joint accounts belonging to Plaintiff and Plaintiff's son.  (Id. ¶ 6d–e.)  Plaintiff's son asserts that between October 16, 2009 and December 18, 2009, he transferred $750,000.00 back into the Citizens Bank account from which those funds originated.  (Id. ¶ 6e.)

Plaintiff's son explained that at the time he took over managing Plaintiff's affairs, there were at least seven accounts that he needed to consolidate and organize.  (Pl.'s Mem. Opp. Def.'s Mot. Summ. J., Ex. B2, Supp. Decl. of Vincent E. Fumo, II, Apr. 30, 2013 ("Fumo II Supp. Decl.") ¶ 7.)  Plaintiff's son wanted Plaintiff to open a savings and check account at a bank so that the funds could be managed electronically, but some banks, including Wachovia Bank, would not accept Plaintiff's money.  (Id. ¶¶ 8–9.)  Plaintiff's son transferred money from Citizens Bank and ING Direct "[a]t some point during the time" he was managing his father's accounts, because for reasons unknown to Plaintiff's son, both banks unilaterally closed the accounts.  (Id. ¶12.)  In October 2009, Plaintiff's son opened an account in his name with Fidelity, believing he could later add Plaintiff as a joint account holder, so that he could transfer money in certain of Plaintiff's bank accounts into the Fidelity account in order to "enhance the earning potential" of some of Plaintiff's money, which at that time was in regular bank accounts.  (Id. ¶ 14–17.)  After Plaintiff's son learned he could not add Plaintiff to the account, he opened a joint account at Fidelity, in April 2010, and funded the joint account with the same amount of Plaintiff's funds that had been placed in the Fidelity account in Plaintiff's son's name.  (Id. ¶ 17.)

Plaintiff alleges that the IRS relied on Suspicious Activity Reports ("SARs") issued by Citizens Bank and ING Direct Bank in 2010 in "erroneously concluding that Plaintiff transferred cash to his son." (Compl. ¶ 117.)  Plaintiff requested the SARs from the IRS, but as of the date the Complaint was filed, the IRS had not provided them.  (Id.)  Plaintiff also alleged that IRS Appeals Officer Edward Devine permitted his attorney to review the SARs and directed Plaintiff's attorney to make a Freedom of Information Act Request to the IRS Disclosure Office in Atlanta, Georgia.  (Id. ¶ 118.)  Plaintiff maintains that information in the SARs shows that Plaintiff's son transferred funds into and out of accounts at Citizens and ING Direct Banks, but that the SARs do not contain information concerning the ultimate disposition of the funds transferred.  (Id. ¶ 119.)  Plaintiff alleges that if the IRS had further investigated the disposition of the funds, it would have learned that the transferred funds were used by Plaintiff's son pursuant to Power of Attorney to pay Plaintiff's bills, including restitution and criminal fine payments.  (Id.)  In response to each of those allegations, Defendant answered "[t]he allegation contained in [paragraphs 117–119] relates to information protected from disclosure; therefore, the United States contends no response is required."  (Def.'s Answer ¶¶ 117–19.)

### E.   The Excise Tax Assessment

IRS Agent Kenneth Roton ("Agent Roton") worked on the jeopardy assessment for unpaid excise tax against Plaintiff and investigated "the benefits that [Plaintiff] received from Citizens Alliance in 2002, 2003, and 2004."  (Def.'s Mot. Summ. J., App'x, Declaration of Kenneth Roton ("Roton Decl."), Aug. 23, 2013, ¶¶ 2, 12.)  The IRS assessed Plaintiff with an excise tax pursuant to 26 U.S.C. § 4598, because "[Plaintiff], as a disqualified person, received excess benefits in 2002, 2003, and 2004 from Citizens Alliance For Better Neighborhoods (CABN or Citizens Alliance), a tax-exempt organization."  (Id. ¶ 4.)  The IRS assessed Plaintiff

with $191,451.63 in unpaid excise tax for the 2002, 2003, and 2004 tax years, as well as $47,862.92 in penalties for the same tax years, because Plaintiff did not file IRS Form 4720A tax returns to report the benefits he received from Citizens Alliance.  (Id. ¶¶ 6–7.)

Citizens Alliance is a nonprofit organization that has had tax-exempt status pursuant to section 501(c)(3) of the Internal Revenue Code since August 13, 1999.  (Id. ¶ 8.)  Agent Roton understood from his review that Plaintiff, with the assistance of employees in his State Senate district office, established Citizens Alliance.  (Id. ¶ 9.)  Agent Roton's understanding was that Plaintiff exercised ultimate authority over Citizens Alliance and approved all of its significant projects between January 1, 2002 and December 31, 2004.  (Id. ¶ 10.)  Plaintiff was convicted in 2009 in part for conspiring to knowingly devise a scheme to defraud Citizens Alliance of money and property.  (Id. ¶ 11.)

As part of Agent Roton's investigation he reviewed the evidence offered at Plaintiff's criminal trial concerning Plaintiff's involvement with and any benefits Plaintiff received from Citizens Alliance.  (Id. ¶ 13.)  On July 21, 2009, Agent Roton met with the Acting Executive Director of Citizens Alliance, as well as the attorney for Citizens Alliance.  (Id. ¶ 14.)  Agent Roton asked Citizens Alliance to produce all files relating to the benefits it gave Plaintiff in 2002, 2003, and 2004, but Citizens Alliance responded that almost all relevant files had been previously seized by the United States Government for use in the criminal investigation of Plaintiff.  (Id.)

From his investigation, Agent Roton established that Plaintiff received "at least $765,806.50 in benefits from Citizens Alliance in 2002, 2003, and 2004."  (Id. ¶ 15.) Specifically, Agent Roton found that Plaintiff received $285,321.18 in benefits from Citizens Alliance in 2002, $384,022.05 in 2003, and $96,463.29 in 2004, from the following:

|  | **2002** | **2003** | **2004** |
|---|---|---|---|
| Consumer Goods | $10,652.30 | $4,018.87 | $508.24 |
| Tasker Street Rent | $74,138.52 | $93,148.13 | $53,433.81 |
| Farm Equipment | --- | $71,813.65 | --- |
| Cell Phone Service | $3,892.35 | $2,003.00 | $2,870.27 |
| Cars | $20,957.59 | $53,111.87 | $12,893.97 |
| Political Polling | $127,000.00 | $127,560.40 | --- |
| Cuba Trips | $22,000.00 | --- | --- |
| Gazela Painting | --- | $23,333.00 | $26,667.00 |
| Private Investigator Payments | $3,250.00 | --- | --- |
| Lobbying Against Construction of Dunes in Ventnor, New Jersey | $21,689.85 | $5.00 | --- |
| Personal Use of Citizens Alliance Employees | $1,740.57 | $4,028.15 | --- |
| **TOTAL** | $285,321.18 | $384,022.05 | $96,463.29 |

(Id. ¶ 27.)

F.     **Plaintiff's Transfer of Real Property Interests**

The IRS assigned Officer Lewis to work on the jeopardy assessment against Plaintiff in

December 2012.  (Lewis Decl. ¶¶ 2, 4.)  Officer Lewis established from her investigation into

Plaintiff's assets that as of February 2007, Plaintiff owned seven parcels of real property.  (Id. ¶

5.)  Officer Lewis stated that between February 2007 and December 2012, Plaintiff transferred

away all or part of his interest in those seven real properties, and that most of them were

transferred for less than their fair market value.  (Id. ¶ 6.)

On June 12, 2008, Plaintiff sold his property at 1831 East Passyunk Avenue,

Philadelphia, Pennsylvania, for $235,000.  (Id. ¶ 9.)

In 2011, Plaintiff transferred an interest in the following three properties to his fiancée,

Carolyn Zinni ("Zinni"), for less than what the IRS considers their fair market value:

(1) On October 18, 2011, Plaintiff conveyed his property located at 30 Fiesta Way, Ft. Lauderdale, Florida, for $10, to himself and Zinni as joint tenants with a right of survivorship. Zinni sold the property on April 12, 2012, for $2,325,000. Zinni received more than $1 million from the sale, and the remaining $1.1 million went towards Plaintiff's criminal restitution obligations.

(2) On October 12, 2011, Plaintiff conveyed his property located at 108 Kenyon Avenue, Margate, New Jersey, for $10, to himself and Zinni as joint tenants with a right of survivorship. Zinni paid $10 for her interest in the property, which the IRS estimates as having a fair market value of close to $1.1 million. Plaintiff and Zinni leased the property to Kenyon Lessee, LLC (whose sole member is Zinni), for a forty-year period, in exchange for no consideration. Officer Lewis was informed that Kenyon Lessee has advertised that it is leasing the property and is asking $3,000–$40,000 a month in rent.

(3) On October 18, 2011, Plaintiff conveyed his entire interest in 99 acres of farmland located at 670 River Road, Halifax, Pennsylvania to Zinni for $1.00.[8] Officer Lewis estimates the fair market value for that property as $337,552.

(Id. ¶ 7.)

Plaintiff conveyed the following three properties to himself and his son, Vincent E. Fumo, II, as joint tenants with a right of survivorship, for less than what the IRS considers their fair market value:

(1) On December 16, 2008, Plaintiff, trading as Champion Investments, conveyed his interest in 1936-38-40 South 13th Street, Philadelphia, Pennsylvania, to himself and his son, as joint tenants with the right of survivorship, for $1.00. Officer Lewis estimates the fair market value of that property as $130,000.

(2) On October 12, 2011, Plaintiff conveyed his property located at 6601 Monmouth Avenue, Ventnor, New Jersey, Units A, D, and E, to himself and his son, as joint tenants with a right of survivorship. Officer Lewis estimates the fair market value of that property at the time of conveyance as $525,000. Plaintiff's son paid $10 for his interest in that property.

---

[8] Plaintiff states in his declaration that he transferred his entire interest in the farm, rather than a survivorship interest, "in recognition of many years of faithful, loving, loyal devotion" because Zinni stood by Plaintiff throughout his trial and under very difficult circumstances during his imprisonment, driving nine hours each way to visit him in prison every month. (Fumo Decl. ¶ 7d.)

> (3) On January 22, 2010,[9] Plaintiff obtained an open-ended mortgage against the property located at 2220 Green Street, Philadelphia, PA, as collateral for an equity line of credit between the taxpayer and the Fumo Family Limited Partnership, in the amount of $1.4 million.  The open-ended mortgage was recorded with the Commissioner of Records for the City of Philadelphia on January 25, 2010.  On February 21, 2012, Plaintiff transferred that property to himself and his son, as joint tenants with a right of survivorship, for $10.00.  Officer Lewis stated that due to the property's unique attributes, there were no comparable properties in the Philadelphia area, but that in 2008 Plaintiff had listed the property for sale for approximately $7 million.  The IRS concluded that, based on those facts, the amount of the mortgage, and other publicly available documents, the property had a fair market value of more than $3 million at the time of conveyance.

(Id. ¶ 8.)

Officer Lewis stated although the "search was somewhat limited," no other properties currently owned by Plaintiff, other than the ones described above, were located.  (Id. ¶ 10.) Officer Lewis explained that because a formal tax assessment had not yet been made against Plaintiff, only public databases and public records were accessed to investigate Plaintiff.  (Id. ¶ 10 n.1.)

Plaintiff asserts that he transferred interests in real estate to his son and fiancée as an estate planning device, with the advice and assistance of a certified public accountant, in light of the scheduled expiration of exemptions from estate and gift taxes commonly known as the "Bush tax credits" which were initially set to expire on December 31, 2011, and later set to expire on December 31, 2012.  (Fumo Decl. ¶ 7c.)  Plaintiff reported the 2011 real estate transfers on a timely filed United States Gift Tax Return (Form 709).  (Compl. ¶ 76i.)  The United States denies Plaintiff's allegations, except to admit that Plaintiff timely filed a United States Gift Tax Return (Form 709) for the tax year 2011.  (Def.'s Answer ¶ 76i.)

---

[9] While the declaration says the mortgage was obtained on January 22, 2000, based on other documentation submitted to the Court it appears that the correct date is January 22, 2010.

G.    **The 2010 Letters**

Defendant made the jeopardy assessment against Plaintiff on March 21, 2013.  Several

months later, Plaintiff's ex-wife testified at a hearing on July 6, 2013, in the Court of Common

Pleas, Orphan's Court.  (Def.'s Mem. Supp. Mot. Summ. J. at 7–8.)  The hearing concerned the

Fumo family trust, and at the hearing, handwritten letters Plaintiff wrote to his ex-wife from

prison were offered into evidence.  (Id.)  The IRS obtained copies of the letters, which are

attached to Defendant's Motion for Summary Judgment, which was filed on September 10,

2013.  (Id.)  Excerpts from the letters which Defendant relies on in its briefing contain the

following statements:

| Statement | Source | Exhibit No. |
|---|---|---|
| "[M]y goal is to become as judgment proof as possible.  I want to 'own nothing but control everything' ☺." | Letter, Oct. 24, 2010, at 4. | Def.'s Mem. Supp. Mot. Summ. J., App'x Ex. T. |
| "I never want to be this vulnerable to the Government or any creditors again in my life!  These fines & restitution were a grossly unfair outrage! ☹" | Letter, Oct. 24, 2010, at 4. | Def.'s Mem. Supp. Mot. Summ. J., App'x Ex. T. |
| "As to the $1,000,000 policy I sold it along with almost all of my investment real estate to pay legal bills!☹" | Letter, Sept. 17, 2010, at 4. | Def.'s Mem. Supp. Mot. Summ. J., App'x Ex. S. |
| "As you know I am broke & still have the possibility of more litigation regarding my sentence etc.  All I have basically left is my real estate which is stuck in this economy.  ☹ . . . .I am still getting my pay out from Dillworth until 1-1-11.  Then that stops & I am really in financial jeopardy!" | Letter, Sept. 17, 2010, at 4. | Def.'s Mem. Supp. Mot. Summ. J., App'x Ex. S. |

The full text of the September 17, 2010 letter from Plaintiff to his ex-wife, omitting a

brief discussion about their daughter not relevant to this case, is as follows:

> As to [Allie's] finances here's what I understand:
> The FLP has 2 assets, approx. $650,000 in cash plus an
> approximate $1,400,000 loan to me for my fines and restitution
> (secured by Green ST.)
> Vincent is trying to get me to get a loan from a Bank for the $1.4
> million so he can cash out of the FLP.  But given the economy and

my situation this is not feasible and too costly.  The best they were able to do was a 5 yr interest only loan with a $32,000 [illegible] fee!  That won't work!

If I'm going to pay interest I might as well pay it to the FLP.

Currently Vincent has already gotten about $370,000 in distributions so Allie's trust is entitled to a like amount!  This could easily come from the approx $650,000 in cash.

Then there could be another distribution of $125,000 to Vincent and another $125,000 to Allie's trust.  This would leave some $'s for operating expenses, etc.

I am paying over $60,000 in interest/year so there could be general distributions of the after tax $'s to Vince's and Allie's trust.

Being in here it is <u>very</u> difficult to get things done!  I have to rely on "snail mail" and others (like Andy) so it takes forever!

If you would be willing to help "get [s***] done" regarding these issues, I would greatly appreciate it and it would help protect Allie's interests!

As to the $1,000,000 policy I sold it along with almost all of my investment real estate to pay legal bills! ☹

I didn't think this was irresponsible since I had set up and funded the FLP and Allie's Trust!

As you know I am broke and still face the possibility of more litigation regarding my sentence etc.

All I have basically left is my real estate which is stuck in this economy! ☹

I've been trying to rent everything, including Green ST. so I can pay for the taxes and upkeep etc.

I am still getting my pay out from Dilworth until 1-1-11.  Then that stops and I am really in financial jeopardy!

But I've been down before and have always bounced back even stronger!  So I am hopeful that my "spirit" will allow me to do the same this time! ☺

Please write and let me know if you will help out with the FLP!

Also, I will contact Dennis and see what's up with the IRS [s***] and CABN!

Thanks!

(Def.'s Mem. Supp. Mot. Summ. J., App'x Ex. S.)

The full text of the October 24, 2010 letter from Plaintiff to his ex-wife, omitting a brief

discussion regarding an ill acquaintance not relevant to this case, is as follows:

As to the FLP and Allie's Trust, I am still confused and not sure that my wishes are being carried out!  That is why I asked you to

get involved!  Andy always says that everything is fine and under control and then I find out later that it is not!  I am at his (and many other) mercy in here so I have to tread carefully!

I never paid attention to the details of all this stuff when I was on the outside because I always had someone who was competent to take care of the details.  But now it is different!  ☹

Confidentially, I met with [illegible attorney's name] when he visited me a while ago and he told me of the problems.

He is a brilliant lawyer who has helped me with all of this stuff Pro Bono, but he's not the forceful type!  ☹

So I need you to make sure that all of the I's are dotted and the T's crossed, if you will.

Andy is supposed to have sent me a letter laying out what he has accomplished but I haven't gotten it yet!  ☹ Maybe in next week's mail!?

In short however this is what I want accomplished:

1 – The FLP has lent me about $1,400,000 to pay off my fines and restitution, which I have done.  The terms were supposed to be interest only payments at less than [illegible percent] (whatever the min legal rate is) for the 1st 5 years and then the loan would be amortized over 25 years from that point.  All payments into the FLP.

2 – The loan is to be secured by a mortgage against Green St. and 108 S. Kenyon Ave.

3 – The Green ST. mortgage is to be subordinate to a $250,000 note, also secured by Green ST, from me to Carolyn.  This is for the almost $200,000 that she put up to pay off the note to the Estate of [illegible] that was in 1st position.

4 – The security on Green ST. is [illegible] and when Green ST is sold, I must pay the FLP a min of $100,000 to a [illegible] of $250,000 to get released from the mortgage.  Then the balance of the mortgage will be secured by Kenyon Ave only.

5 – There are to be no prepayment fees ever charged.  And any late fees on the mtg payments shall be [illegible] (at most)

Note/ my goal is to become as judgment proof as possible.  I want to "own nothing but control everything" ☺

I never want to be this vulnerable to the Government or any creditors again in my life!

These fines and restitution were a grossly unfair outrage! ☹

6 – There was supposed to be about $650,000 in cash in the FLP. This is to be divided equally among the shareholders:  Allie, Vincent, and me.  But my share is only about [illegible percentage] or so.  The rest is split evenly between Vincent and Allie's Trust.

7 – Vincent has already received a distribution of about $300,000. So of the $650,000, Allie's Trust is to receive an equal amount 1st then the balance is to be distributed proportionately Plus I wanted

to keep about $50,000 to $25,000 in cash in the FLP for expenses and cash flow.

8 – I believe that [illegible name] is the current trustee on Allie's Trust.  I want that changed to Carolyn.  Allie does not want Vincent so I am ok with that.

By doing the above, I can get the Feds off my back to some degree and also especially preserve Kenyon Ave for Allie's estate!

If you have any ideas to further my goals and to preserve my "estate" let me know!

I'd rather you not show this letter to Andy so I am enclosing another letter to you that you can show him! ☺

Please write soon!

Thanks!

P.S. I have to be nice to Andy since I made him Trustee of the FLP and Treas. of FFS! ☺

(Def.'s Mem. Supp. Mot. Summ. J., App'x Ex. T.)

Plaintiff asserts that those letters arose in the context of "an ongoing and ever increasing dispute concerning a family trust [Plaintiff] had set up several years beforehand."  (Fumo Decl. ¶10.)  Plaintiff, prior to his conviction, funded a family trust for his children, from which his son, pursuant to Power of Attorney for Plaintiff, borrowed approximately $1.4 million from the Fumo Family Limited Partnership, the most significant asset in the previously established family trust. (Id. ¶ 11.)  The loan was secured by a mortgage, the terms of which were negotiated by Plaintiff's son, and which was signed by Plaintiff's son.  (Id. ¶ 13.)  Soon after entering the transaction, Plaintiff realized the loan provided for repayment in January 2013, when Plaintiff would still be incarcerated, and had an interest rate approximately two times higher than the interest rate allowed by the IRS for family transactions and which was higher than commercially available interest rates.  (Id. ¶ 14.)  Shortly after the transaction was completed, Plaintiff attempted to renegotiate the terms of the loan, but "began to experience resistance from [his] children who were the beneficiaries of the trust which owned [sic] by the FFLP from which [Plaintiff] borrowed the money."  (Id. ¶ 15.)  Plaintiff further claims that these letters were

written in the context of seeking his ex-wife's input and assistance regarding what he believed was a necessary renegotiation of the loan and how to handle their daughter's trust.  (Id. ¶ 17.) Plaintiff claims that his comment in the letter about "financial jeopardy" "was intended to express concern over the fact that [his] law firm salary would cease in a few months" and that he "had become very concerned about cash flow, and, in particular, the ability to make continued payments on the loan to the FFLP unless there was a renegotiation of lower interest and the due date."  (Id. ¶ 23.)  Plaintiff maintains that all of the excerpted statements from his letters that Defendant relies on "were made as part of [his] efforts to renegotiate the loan with FFLP" and were not about any IRS concerns.  (Id. ¶ 24.)

### H.   Procedural History

As detailed above, the IRS issued three Notices of Jeopardy Assessment and Levy and Right of Appeal to Plaintiff on March 21, 2013, one each for personal income tax liability for tax years 2001–2005, gift tax liability for tax year 2009, and excise tax liability for tax years 2002–2004.  After exhausting his administrative remedies,[10] Plaintiff filed a Complaint for Judicial Review of the Jeopardy Assessment and Jeopardy Assessment Levy on June 13, 2013. The Defendant filed its Answer on July 3, 2013, and filed a Motion for Summary Judgment on September 10, 2013.  Plaintiff filed a Cross-Motion for Summary Judgment on November 11,

---

[10] Plaintiff formally protested the IRS's October 3, 2012 proposed income tax adjustments on December 4, 2012.  (Compl. ¶ 29.)  Plaintiff's protest was sent to the IRS Appeals Division.  (Id. ¶ 30.)  The IRS notified Plaintiff on January 24, 2013 that his case had been assigned to Appeals Officer Edwards Devine.  (Id.)  As of January 24, 2013, the IRS had not provided any notice to Plaintiff that it was considering excise or gift tax adjustments.  (Id. ¶ 32.)  Plaintiff, through counsel, requested review/redetermination of the jeopardy assessments on April 17, 2013, pursuant to 26 U.S.C. § 7429(a).  (Compl. ¶ 4e.)  Plaintiff, through counsel, sought review of, and a Collection Due Process hearing concerning, the Notices of Jeopardy Levy on April 18, 2013, also pursuant to 26 U.S.C. § 7429(a).  (Compl. ¶ 4f.)  By letters dated June 5, 2013, the IRS notified Plaintiff that it would not abate or remove the jeopardy assessments or levies. (Compl. ¶ 4h.)  Plaintiff then filed the Complaint in this case on June 16, 2013, pursuant to 26 U.S.C. § 7429(b).

2013, including as Exhibit F the opinion letter of Thomas W. Ostrander, a Partner with the law firm of Duane Morris who practices tax law.  Defendant filed its Reply Brief and its Motion to Exclude Expert Testimony on December 10, 2013.  Plaintiff filed a Sur-Reply Brief on December 20, 2013, and filed a Memorandum in Opposition to Defendant's Motion to Exclude Expert Testimony on December 23, 2013.  This Court heard oral argument from the parties regarding their Cross-Motions for Summary Judgment and Defendant's Motion to Exclude Expert Testimony on March 18, 2014.  Plaintiff subsequently submitted a letter to the Court as a "supplemental argument" on March 20, 2014.  In response to that letter, Defendant filed its Response to Plaintiff's Second Sur-Reply on March 24, 2014.  As the briefing process has been thoroughly exhausted, the Cross-Motions for Summary Judgment and the Motion to Exclude Expert Testimony are now ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA

Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue.  Anderson, 477 U.S. at 249–50.

Notably, these summary judgment rules do not apply any differently where there are cross-motions pending.  Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).  As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'"  Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

III.     **DISCUSSION**

The Court will first address Defendant's Motion to Exclude the expert report of Thomas Ostrander.  The Court will then address each element of the applicable Treasury Department regulation regarding the use of the jeopardy assessment before making a reasonableness determination regarding the jeopardy assessment made against Plaintiff.

A.     **Plaintiff's Expert Report**

Defendant moved to exclude the expert report of Thomas Ostrander ("Ostrander"), which Plaintiff attached as an exhibit to his Motion for Summary Judgment.  Defendant argues that Ostrander's report should be excluded because Ostrander's legal opinions are not admissible expert testimony and because the Court has sufficient expertise to resolve legal issues without his assistance.  Defendant argues in the alternative that Ostrander's report should be excluded because it is irrelevant.  Plaintiff responds by arguing that, in reviewing a jeopardy assessment, this Court may rely on evidence that might otherwise be inadmissible under the Federal Rules of Evidence, and that even if those rules applied, Mr. Ostrander's expert opinion would be admissible because it assists the trier of fact in determining a fact in issue.  Plaintiff also argues that the IRS submitted its own expert opinions via the Notices of Jeopardy Assessment and Levy and Right to Appeal and via the declarations of its representatives discussed above, and therefore cannot ask the Court to exclude Plaintiff's expert materials.

A court "may consider evidence which might not be admissible at a trial" when reviewing a jeopardy assessment.  Hecht v. U.S., 609 F. Supp. 264, 266 (S.D.N.Y. 1985) (citing U.S. v. Janis, 428 U.S. 433, 447 (1976); Patrick v. U.S., 524 F.2d 1109, 1115–16 (7th Cir. 1975)).  Other courts have found that "evidence that would normally be inadmissible under the Federal Rules of Evidence" may be evaluated when reviewing a jeopardy assessment.  Golden

ADA, Inc. v. U.S., 934 F. Supp. 341, 344 (N.D. Cal. 1996) (citing Harvey v. U.S., 730 F. Supp. 1097, 1104 (S.D. Fla. 1990)).  Defendant concedes in a footnote that "in a jeopardy proceeding, evidence need not be submitted in a form that satisfies the requirements of the Federal Rules of Evidence," but maintains that "the more lenient standard does not open the door for a party to invade the province of the Court by testifying on issues of law."  (Def. Mem. Supp. Mot. to Exclude Test. 2 n.1.)

Ostrander's report, an opinion letter addressed to Plaintiff and his counsel, outlines the facts set forth in the Complaint and its exhibits and reviews the relevant IRS assessment and tax collection procedures which would apply to the assessments against Plaintiff in the absence of a jeopardy assessment.  To the extent that Ostrander's report explains the landscape of those procedures, the report is helpful to the Court because it illustrates the difference between a jeopardy assessment and other more typical means of tax assessment and collection.  To the extent that Ostrander's report offers conclusions regarding the IRS's ability to collect the additionally assessed taxes from Plaintiff in the absence of a jeopardy assessment, the Court has not considered those conclusions as they are outside of the scope and purpose of judicial review of a jeopardy assessment.  Indeed, the Court need not consider what other means of collecting the assessed tax liabilities from Plaintiff the IRS would have in the absence of a jeopardy assessment, because the Court is tasked only with reviewing whether, having been made, the jeopardy assessment was reasonable and appropriate under the circumstances.[11]  See, e.g., Hecht,

---

[11] Both parties have argued the relevance, likelihood of success, and means by which the IRS could later collect from Plaintiff if the assessed tax liabilities are sustained in Tax Court. Plaintiff argued in briefing and at oral argument, in part relying on Ostrander's expert report, that the IRS could easily bring a fraudulent transfer action or collect taxes, interest, and penalties from Plaintiff's fiancée or son as nominees or transferees.  Defendant argued that such processes are not as easy as Plaintiff makes them out to be, and that, in any event, the IRS does not have a burden to prove other means of collection in the absence of a jeopardy assessment.  The Court finds that these issues are outside the scope of its review of the reasonableness of the jeopardy assessment when made, which is concerned only with whether Defendant can show that Plaintiff

609 F. Supp. at 266 ("The only issues before the Court are whether the jeopardy assessment is reasonable . . . and whether the amount of the assessment is appropriate under the circumstances . . . .")  The Court is free to ignore portions of, or all of, Ostrander's report, but it need not exclude it.  Accordingly, the Defendant's Motion to Exclude Expert Testimony is denied.

### B.        The Jeopardy Assessment

Pursuant to 26 U.S.C. § 6861, following notice and demand to the taxpayer, the IRS is authorized to immediately assess and collect income, estate, gift, or certain excise taxes if the IRS determines that collection of the tax would be jeopardized by delay.  26 U.S.C. § 6861(a). Any interest, additional amounts, and additions to the tax provided by law may also be assessed. Id.  United States Treasury Department regulations provide that a jeopardy assessment is appropriate in the following situations:

    i.  the taxpayer is or appears to be designing quickly to depart from the United States to conceal himself;

    ii.  the taxpayer is or appears to be designing quickly to place his property beyond the reach of the government by removing it from the United States, or by concealing it, or by transferring it to another person, or by dissipating it; or

    iii.  the taxpayer's financial solvency appears to be imperiled.

26 C.F.R. 1.6851–1(a)(1).

"Jeopardy assessments pursuant to § 6861 are extraordinary measures which bypass the established preassessment procedures the government uses to collect its revenues.  Section 6861 is usually employed to prevent persons operating outside the law from laundering or concealing large amounts of cash in order to escape their tax liabilities."  George F. Harding Museum v.

---

is or appears to be "designing quickly to place property beyond the reach of the government" through various means.  See 26 C.F.R. 1.6851–1(a)(1)(ii).  Accordingly the Court will not address those arguments other than by acknowledging them here.

U.S., 674 F. Supp. 1323, 1326 (N.D. Ill. 1987).[12]  The Internal Revenue Manual[13] states that "[j]eopardy assessments should be used sparingly and care should be taken to avoid excessive and unreasonable assessments . . . ."  See id. (citing Internal Revenue Manual Section 4584.2); see also Lindholm v. U.S., 808 F. Supp. 3, 6 (D.D.C. 1992) (finding a jeopardy assessment unreasonable where the IRS had not shown that the taxpayer, who had arranged his assets with "complexity" and in a manner where he avoided ownership in his own name of virtually all his assets, presented "the type of risk that justifies the extraordinary measure of a jeopardy assessment.").  The Internal Revenue Manual urges examiners to be alert to conditions where a jeopardy assessment may be necessary to protect the government's interest, including but not limited to narcotics cases, cases involving taxpayers involved in organized crime, wagering cases, strike force cases, cases involving taxpayers who are reasonably believed to be receiving income from an illegal activity, cases involving taxpayers known or suspected of having plans for leaving the United States without making provisions for payment of their taxes, and cases where an individual is in physical possession of cash or its equivalent in an amount greater than $10,000 and disclaims ownership of it.  See George F. Harding Museum, 674 F. Supp. at 1326 (citing Internal Revenue Manual Section 4584.2) (noting that "Congress, in enacting § 7429, approved the guidelines now contained in the Internal Revenue Manual, § 4584.2") (citing Strauser v. U. S., 535 F. Supp. 957, 960 (N.D. Ill. 1982) (citing S. Rep. No. 94-938, 94th Cong.

---

[12] Because a district court's decision following review of a jeopardy assessment may not be appealed and due to the rarity of jeopardy assessments, there is a dearth of appellate jurisprudence regarding jeopardy assessment review.  Therefore, the Court cites district court cases, including many from outside the Third Circuit.

[13] While "internal rules of agency procedure" are distinct from "regulations promulgated pursuant to statutory directive" in that they do not confer "substantive rights or privileges upon taxpayers," Groder v. U.S., 816 F.2d 139, 142 (4th Cir. 1987) (citing U.S. v. Caceres, 440 U.S. 741 (1979)), they are nonetheless illustrative of how the IRS intends the jeopardy assessment mechanism to be used.

2d Sess. 365 n.6 (1976), U.S. Code Cong. & Admin. News 1976, p. 2897) ("The committee believes that the general standards set forth in the Internal Revenue Manual relating to the conditions which must exist before a jeopardy or termination assessment is made are reasonable."))); see also Burd v. U.S., 774 F. Supp. 903, 909 (D.N.J. 1991) ("While it is true that the situations [in the IRS Manual] are not an exclusive list of the situations in which a jeopardy assessment can be made, the list is illustrative of the types of situations where jeopardy procedures should be used.").

Unlike the normal tax collection process, where "there is usually a considerable lapse of time" between the taxpayer's first notice of an impending tax collection and the actual enforced collection of the tax, a jeopardy assessment allows the IRS to "immediately assess and levy upon the taxpayer's property," forcing the taxpayer to litigate the merits of the assessment and the amount of the assessment after the tax has already been collected.  See Burd v. U.S., 774 F. Supp. 903, 905 (D.N.J. 1991).  In light of "the drastic nature of [jeopardy assessments], Congress concluded that the taxpayer should be able to obtain immediate judicial review of the propriety of the jeopardy assessment."  Burd, 774 F. Supp. at 905; see also Homan Mfg. Co. v. Long, 242 F.2d 645, 651 (7th Cir. 1957) ("There is little doubt but what a jeopardy assessment is a statutory label for the sovereign's stranglehold on a taxpayer's assets."); Clark v. Campbell, 501 F.2d 108, 121 (5th Cir. 1974) (noting that for jeopardy and termination assessments, "Congress has tempered this awesome power of immediate assessment by providing welcome procedural protection in the form of an opportunity for pre-payment litigation").  Thus, a taxpayer against whom a jeopardy assessment has been made may bring a civil action against the United States in the district court for review of the jeopardy assessment.  26 U.S.C. § 7429(b).

The district court's review of the IRS's actions is *de novo*, and gives the IRS's administrative determination regarding the jeopardy assessment no deference whatsoever. See George F. Harding Museum, 674 F. Supp. at 1326 (citing Loretto v. U.S., 440 F. Supp. 1168, 1171–72 (E.D. Pa. 1977) (discussing the legislative history of section 7429 and determining that Congress intended courts to undertake a *de novo* review of jeopardy assessments)).  The district court must determine (1) whether the making of the assessment is reasonable under the circumstances, and (2) whether the amount assessed is appropriate under the circumstances.  26 U.S.C. § 7429(b)(3)(A)(i)–(ii).  The United States bears the burden of proof regarding the reasonableness of the assessment, but the taxpayer bears the burden of proof regarding the appropriateness of the amount assessed.  26 U.S.C. § 7429(g).  "[I]t is not the Court's function to determine the proper tax amount."  Magluta v. U.S., 952 F. Supp. 798, 804 (S.D. Fla. 1996).  "There is an initial presumption that the amounts assessed are reasonable," and a "plaintiff's ultimate tax liability, if any, is irrelevant to this Court's review and determination."  Varjabedian v. U.S., 339 F. Supp. 2d 140, 157 (D. Mass. 2004) (citing Revis v. U.S., 558 F. Supp. 1071, 1079 (D.R.I. 1983); Miller v. U.S., 615 F. Supp. 781, 785 (N.D. Ohio 1985)) (quotations omitted).  "Due to the circumscribed nature of the review, the court must focus on the method of computation itself, rather than the ultimate amount assessed."  Varjabedian, 339 F. Supp. at 157 (citing Wellek v. U.S., 324 F. Supp. 2d 905, 914 (N.D. Ill. 2004)).  If the court determines the making of the jeopardy assessment is unreasonable, or that the amount assessed or demanded is inappropriate, "the court may order the Secretary to . . . abate such assessment, to redetermine (in whole or in part) the amount assessed or demanded, or to take such other action as the court finds appropriate."  26 U.S.C. § 7429(b)(4).  The district court's determination "shall be final and conclusive and shall not be reviewed by any other court."  26 U.S.C. § 7429(f).

29

In the present case, Plaintiff challenges both the reasonableness and appropriateness of the jeopardy assessment. As the Court finds that the assessment does not satisfy the "reasonableness" standard, the Court will abate the levy on those grounds without reaching the appropriateness test.

### 1.  Reasonableness of the Jeopardy Assessment

"Although the 'reasonable under the circumstances test' [set forth in 26 U.S.C. § 7429] is imprecise by nature, the general rule is that a jeopardy assessment is 'reasonable' so long as the decision to impose it falls between 'something more than not arbitrary and capricious' and something less than 'supported by substantial evidence.'" Golden ADA, 934 F. Supp. at 344 (some internal quotations omitted) (quoting Loretto, 440 F. Supp. at 1172 (E.D. Pa. 1977)). As Judge Luongo, the author of Loretto, noted that the distinction between the arbitrary and capricious standard and the substantial evidence standard is difficult to articulate. This Court agrees, but at the very least, it is the government, not the taxpayer, that bears the burden of proof.

The reviewing court "is to give IRS's administrative determination of reasonableness no deference whatsoever." Barry v. U.S., 534 F. Supp. 304, 308 (E.D. Pa. 1982) (citing Loretto, 440 F. Supp. at 1172). "In determining the reasonableness of the government action, the court is not limited to consideration of the information available to the IRS at the time of the assessment but must also consider any subsequently available information that might affect the reasonableness of the jeopardy assessment." Golden ADA, 934 F. Supp. at 344. For purposes of judicial review of the jeopardy assessment, "any relevant information should be considered." Loretto, 440 F. Supp. at 1173 (citing S. Rep. No. 94-938 (part 1), 94th Cong., 2d Sess. 364-65 (1976), reprinted in (1976) U.S. Code Cong. & Admin. News 3439, 3793-94).

In reviewing the jeopardy assessment made against Plaintiff, "the court must determine whether the IRS was reasonable in making the assessment by deciding whether the agency satisfied any one of the criteria set forth in section 6861." Modern Bookkeeping, Inc. v. U.S., 854 F. Supp. 475, 477 (E.D. Mich. 1994). Here, the Court must consider whether the IRS's decision to make a jeopardy assessment because Plaintiff "is or appears to be designing quickly to place his property beyond the reach of the government by removing it from the United States, or by concealing it, or by transferring it to another person, or by dissipating it," was reasonable. 26 C.F.R. 1.6851–1(a)(1)(ii).

Defendant argues that the jeopardy assessment against Plaintiff was reasonable because "it clearly appears that the taxpayer was attempting to put his assets beyond the reach of the IRS," because Plaintiff's net worth has decreased significantly since his conviction, and because after his conviction he has engaged in a dissipation of his remaining assets, further decreasing his net worth. Plaintiff responds that the jeopardy assessment is unreasonable because he has not put assets beyond the reach of the government, nor impeded the government's ability to collect any tax that might be due and owing. In the discussion that follows, the Court will evaluate each element of the applicable Treasury Department regulation regarding jeopardy assessments before making its reasonableness determination.

### a.  "is or appears to be"

United States Treasury Department regulations contemplate that a jeopardy assessment can be found reasonable based on the appearance of jeopardy, rather than by requiring proof of actual jeopardy. See, e.g., Varjabedian v. U.S., 339 F. Supp. at 155 ("The government need not ultimately be correct in thinking that collection was imperiled, rather, 'the government only needs to prove that the circumstances *appear* to jeopardize collection.'") (quoting Wellek v.

U.S., 324 F. Supp. 2d at 911) (citing, *inter alia*, Cantillo v. Coleman, 559 F. Supp. 205, 207 (D.N.J. 1983)) (emphasis in original)); see also Golden ADA, 934 F. Supp. at 345 ("Whether Golden ADA in fact intended to liquidate its assets and place them beyond the reach of the IRS thereby avoiding payment of its taxes is irrelevant.  It is the appearance of such things that is relevant and controlling.").  However, courts have also found that even if a taxpayer's actions "*may* reveal [an] intention to misrepresent [the taxpayer's] income and avoid paying taxes, this does not provide the IRS with the justification for a jeopardy assessment." Burd, 774 F. Supp. at 907 (emphasis added) (noting that "those are precisely the issues that are to be pursued in the United States Tax Court to assess the tax liability of the plaintiff").  The motivation for a taxpayer's transfer of assets is not dispositive, but it may be a relevant consideration in determining whether a jeopardy assessment was reasonable.  DeLauri v. U.S., 492 F. Supp. 442, 445 (W.D. Tex. 1980) (citing cases).  Evidence that controverts the IRS's contentions that a taxpayer is or appears to be placing property beyond the reach of the government is relevant to the reasonableness determination.  See French v. U.S., No. Civ.A. 79-149, 1979 WL 1430, at *2 (E.D. Okla. July 31, 1979) ("Without controverting evidence, the Court must conclude that the purpose of the liquidations and transfers is to put plaintiffs' property beyond the reach of the government.").

   Numerous courts have considered whether a taxpayer's actions placed or appeared to place assets beyond the government's reach.  In Varjabedian, the taxpayer was maintaining "a large hoard of currency" in a safe-deposit box in his sister's name, to which he had access and which he controlled; held assets such as automobiles and bank account funds in his sister's name, which would be transferred back to the taxpayer "when the time was right;" and "took affirmative steps to avoid having to give his social security number to financial institutions," all

factors which supported the IRS's determination that the taxpayer "appeared" to be placing assets beyond the government's reach.  339 F. Supp. 2d at 156.  The taxpayer's behavior during the investigation also supported the court's finding that the jeopardy assessment was reasonable. The day after the taxpayer's home was searched, and despite being told to stay away from a particular bank, he went to the banks where he had accounts and tried to access funds in a safe deposit box, seemingly as part of an effort to "stay 'one step ahead of the government's search warrant of the first safe-deposit box.'"  Id.  The government also submitted evidence showing it found "specific references to avoiding the IRS" in the taxpayer's business files.  Id.

In Golden ADA, the court found that the government had sustained its burden of proving the jeopardy assessment was reasonable under the circumstances, in part by showing that "the taxpayer was made aware that it was the subject of a criminal investigation as well as a civil RICO action after which it continued to liquidate its assets."  934 F. Supp. at 345.  In addition, the taxpayer "sold properties but offered to pay no part of the proceeds to either the government or [a party in a separate lawsuit]" and "the form and whereabouts of other assets, including sale proceeds," were "unknown or beyond the reach of the IRS."  Id.  In a similar case, Olbres v. Internal Revenue Service, the court found a jeopardy assessment was reasonable where the "taxpayers were made aware that they were subjects of a criminal investigation after which they began converting assets to liquid form," and that "they successfully sold properties but paid no part of the proceeds to the government," facts which were contrary to the taxpayers' claim that they were liquidating assets in order to reduce their amount of debt, including taxes owed.  837 F. Supp. 20, 21–22 (D.N.H. 1993) (noting that the taxpayers sold properties after they became aware that they were under criminal investigation for tax evasion, that other properties were for sale, and that the taxpayers' Rolls Royce could not be located).

In French, the court found that the taxpayers' actions would lead "any government official cognizant of [the facts in that case]" to conclude that they were attempting to conceal, transfer, or dissipate their property in order to put it beyond the reach of the government.  1979 WL 1430, at *2 (noting that the court's finding did not mean there was no reasonable explanation for the taxpayers' actions but that the taxpayers offered no evidence to explain their actions).  Specifically, the taxpayers closed sizeable savings accounts and all checking accounts known to the government, disposed of several thousand shares of valuable stock and $400,000 worth of tax-free bonds, transferred all their real property to their children or through their children to a friend, and transferred substantially valuable contractual rights to receive installment payments to the same friend.  Id.  The government submitted evidence to show that approximately $1 million in assets had been liquidated by the plaintiffs in the two years prior to the jeopardy assessments, and that the government did not know the whereabouts of the proceeds.  Id.  Other individuals who may have had superior knowledge of the taxpayers' subjective intent told a revenue officer that they believed the taxpayers were attempting to conceal their assets.  Id.

Unlike the plaintiffs in French who offered no explanation for the actions that led the IRS to make a jeopardy assessment against them, Plaintiff in this case offers detailed explanations controverting the IRS's conclusions regarding his financial accounts and real property assets. First, with respect to Plaintiff's financial accounts, Plaintiff gave his son Power of Attorney over his affairs shortly before entering prison so that while Plaintiff was incarcerated, his son could pay and arrange for the payment of Plaintiff's various bills and financial obligations, including payment of criminal fines and restitution.  The declarations from Plaintiff and his son rationally explain why the monetary transfers between their various accounts occurred, and the timing,

amount, and associated expenditures for the transfers between the accounts support those explanations.

Defendant now maintains that Plaintiff transferred $500,000 of the $920,000 to his son shortly before Plaintiff entered prison and before Plaintiff's son was granted Power of Attorney, and was therefore a gift.  (Tr. at 37:2–7.)  Plaintiff entered prison on August 31, 2009, gave his son Power of Attorney on August 21, 2009, and made the $500,000 transfer to his son's account on August 19, 2009.  (Def.'s Resp. to Pl.'s Second Sur-Reply 5.)  Defendant argues that regardless of whether Plaintiff's son actually added Plaintiff to an account he opened in 2009, and regardless of whether Plaintiff's son actually paid Plaintiff's bills using the money in the account, "the fact that the son chose to take these steps does not change the nature of the father's original gift."  (Def.'s Mem. Supp. Mot. Summ. J. 11, n.5.)

The Court, however, cannot overlook the timing of when the account was opened relative to when Plaintiff's son was given Power of Attorney, and relative to when Plaintiff was preparing to enter prison and needed someone to manage his affairs.  Viewing these facts objectively, and in light of the fact that Plaintiff was about to begin serving a multi-year prison sentence, it is certainly plausible that Plaintiff took a series of steps to arrange for his son to manage his financial affairs.  The fact that the $500,000 transfer occurred two days before Power of Attorney was granted to Plaintiff's son, as opposed to after it was granted, does not definitively render the transfers "gifts" such that a jeopardy assessment on those grounds was reasonable.  See DeLauri, 492 F. Supp. at 445 (noting that a taxpayer's motivations, while not dispositive, are relevant to a court's reasonableness determination).

Even if the Court does not credit Plaintiff's proffered explanations, Plaintiff's actions are distinct from those of the taxpayers in French and Golden ADA.  Unlike in French, Plaintiff did

35

not close his bank accounts in order to remove money.  Rather, Plaintiff transferred money into his son's account and into other joint accounts created for the purpose of managing Plaintiff's affairs while he was in prison.  Although Defendant argues that the manner in which Plaintiff and his son moved large amounts of funds repeatedly between accounts appeared "as if they were trying to hide where the funds originated," (Def.'s Mem. Supp. Mot. Summ. J. 6.), the frequency or total number of traceable fund transfers does not equate to an effort to hide funds from the government, nor does it necessarily create the "appearance of" hiding funds from the government.  See Lindholm, 808 F. Supp. at 6 (finding a jeopardy assessment unreasonable where "despite the complexity with which plaintiff arranged his assets, he apparently did not 'hide' them" and had not defaulted on debts or hidden from creditors), compare Schmitt v. U.S., 662 F. Supp. 900, 901 (D. Minn. 1987) (finding a jeopardy assessment reasonable in part because the taxpayer "may have tried to conceal his money by holding over $1.5 million in the bank's name, by holding a similar amount of money in his wife's name and by withdrawing approximately $165,000 over a thirteen day period in quantities small enough to avoid federal currency transaction reporting requirements").  Although there were multiple fund transfers between Plaintiff and his son, they were accomplished either shortly before or while Plaintiff's son had Power of Attorney over Plaintiff's affairs due to Plaintiff's impending incarceration and service of his criminal sentence.  Plaintiff's son explained that additional accounts were opened because some banks would not take Plaintiff's money, he was trying to obtain better interest rates for Plaintiff's accounts, and he misunderstood whether he could create a joint account by adding Plaintiff to an already existing account as opposed to opening a joint account in the first place.

Overall, the actions taken by Plaintiff and his son have the appearance of two people trying to manage Plaintiff's expenses, bills, and financial obligations leading up to and during Plaintiff's incarceration, not the appearance of trying to hide money from the government.  In fact, unlike the IRS in the previously-discussed cases, Defendant was able to identify and document the dates, amounts, and details of the fund transfers.  Furthermore, Plaintiff's bank accounts, the amounts they contain, and the amounts and dates of transfers from the accounts are known to the government.  Accordingly, Plaintiff's actions with respect to his financial accounts do not have the appearance of placing assets beyond the reach of the government.

Second, Plaintiff offers reasonable explanations for the real estate transfers that the IRS relied on in making the jeopardy assessment.  Plaintiff maintains that, on the advice of his accountant, he transferred interests in real estate to his son and fiancée as an estate planning device because exemptions from estate and gift taxes commonly known as the "Bush tax credits" were initially set to expire on December 31, 2011, and later set to expire on December 31, 2012. (Fumo Decl. ¶ 7c.)  Defendant argues that Plaintiff's explanation regarding the transfer of interests in real estate is belied by the contents of the 2010 letters Plaintiff wrote to his ex-wife in which he expressed a desire to be "judgment-proof" and "own nothing but control everything" and that those admissions "confirm that he had a plan to hide assets from all his creditors, including the IRS."  (Def.'s Mem. Supp. Mot. Summ. J. 18.)  Plaintiff, however, still owns an interest in the properties at issue, and therefore has not hidden them from actual or potential creditors.  Moreover, Plaintiff reported the 2011 transfers on a timely filed United States Gift Tax Return.  Filing forms with the IRS concerning particular properties undermines any notion of "a plan to hide assets from all [of Plaintiff's] creditors, including the IRS."  (Id.)

Again, putting Plaintiff's explanations aside, Plaintiff's situation is distinct from that in Golden ADA because Defendant knows the location and amount of the proceeds from Plaintiff's real estate sales.  Plaintiff retains an interest in his other real estate properties and holds those assets jointly with individuals known to the government, his son and his fiancée, as opposed to holding those assets solely in others' names like the taxpayers in French and Varjabedian. Moreover, the IRS was able to trace the transfers using only public records, which does not tend to show an appearance of trying to hide assets from the government.  (Lewis Decl. ¶ 10 n.1.). Unlike the taxpayers in Golden ADA and Olbres, Plaintiff paid millions of dollars in restitution to the government in a timely manner, in part using proceeds from a property sale the IRS claims was part of Plaintiff's plan to put assets beyond the government's reach.  Cf. Modern Bookkeeping, 854 F. Supp. at 479 (finding a jeopardy assessment unreasonable and noting that the plaintiffs "presented evidence that once their tax liabilities have been determined, they have regularly paid the amount due.")  Moreover, most of the real estate transactions involved Plaintiff and either his son or his fiancée, as opposed to wholly transferring them to another person or selling them off for cash, which would be harder to trace and could allow Plaintiff to hide the sale proceeds.

In addition to arguing that Plaintiff's conduct with respect to his financial accounts and real property assets shows that Plaintiff had a plan to put assets beyond the reach of the government, Defendant relies on letters Plaintiff wrote from prison to his ex-wife in 2010 as proof that Plaintiff developed a scheme to place assets beyond the government's reach. Defendant argues that these letters are "where [Plaintiff] revealed his plan to avoid any exposure to creditors or the government."  (Def.'s Br. Supp. Mot. S.J. 7.)

With respect to the letters he wrote to his ex-wife, Plaintiff claims that they were written in the context of seeking her input and assistance regarding what he believed was a necessary renegotiation of the loan he had with a family trust asset and more generally how to handle their daughter's trust.  (Fumo Decl. ¶ 17.)  Plaintiff maintains that all of the excerpts from his letters that Defendant relies on "were made as part of [his] efforts to renegotiate the loan with FFLP" and were not about any IRS concerns.  (Id. ¶ 24.)  At oral argument Plaintiff's attorney asserted that the letters should be viewed in the context of Plaintiff being "at war with his own children," who are "fighting with him," and that he was "trying to negotiate through his ex-wife some leverage in a settlement."  (Tr. at 21:2–4.)  Plaintiff's attorney explained that, through the letters, Plaintiff "was attempting to negotiate a resolution with the beneficiaries of the trust, the spokesman for whom, the spokesman for one of those beneficiaries being his ex-wife."  (Id. at 21:12–14.)

These explanations are convincing.  Notably, the IRS did not obtain copies of Plaintiff's letters until several months after the jeopardy assessment had been made.  While the Court "is not limited to the information actually available to or known by the IRS" on the date of assessment, the Court "is to review the reasonableness of [the IRS's determination to make a jeopardy assessment] *as made on the date of the assessment*."  See Penner v. U.S., 582 F. Supp. 432, 434 (S.D. Fla. 1984) (citations omitted) (emphasis added).  Even if the IRS had known of the 2010 letters at the time it made the jeopardy assessment in 2013, Plaintiff's actual conduct during the multi-year IRS investigation of Plaintiff, which began in 2009, did not set off any IRS alarm bells.  Indeed, when Plaintiff was assessed with additional income taxes of approximately $2 million in October 2012, the IRS did not believe a jeopardy assessment was necessary. (Def.'s Answer ¶ 28.)

Moreover, in spite of Defendant's reliance on Plaintiff's ranting that his "goal is to become as judgment proof as possible.  I want to 'own nothing but control everything' ☺," which Plaintiff claims was written in the context of a dispute about his family's trust, Plaintiff has not actually made himself judgment proof.  (Def.'s Mem. Supp. Mot. Summ. J., Ex. T, Pl.'s Ltr. Oct. 24, 2010.)  In fact, Plaintiff paid approximately $1 million in additional restitution to the United States shortly after he was resentenced in November 2011—more than a year after he wrote the letter.  Plaintiff still owns a one-half interest in several valuable properties, and still has accounts in his name that hold millions of dollars.  Plaintiff's mere belief that the fines and restitution obligations that resulted from his criminal conviction "were a grossly unfair outrage" and his statement that he never wants to be vulnerable to the government or to his creditors ever again did not stop him from paying his restitution obligations.  In short, Plaintiff's idle complaints about the situation in which he found himself post-conviction do not rise to the level of the statements in <u>Varjabedian</u>, where the plaintiff's business files contained specific statements about precise means of avoiding the IRS.  339 F. Supp. 2d at 156.  While Plaintiff may truly have wished to never again be vulnerable to the government or to creditors, Defendant has not submitted evidence to show that Plaintiff is delinquent in his court-ordered fines and restitution or that he is in default on any debts owed to other creditors.

Based on the foregoing, the Court finds an absence of an appearance of jeopardy in Plaintiff's case.

### b.  "designing quickly"

The second consideration is whether Plaintiff is or appears to be "designing quickly" to place property beyond the reach of the government.  Few courts evaluating the reasonableness of

a jeopardy assessment have considered the meaning of "quickly."  Those that have considered this term have followed the reasoning in French v. United States, 1979 WL 1430, supra.

In French, the court determined that "the modifying term 'quickly' must be read in the context of the purpose of section 6861 as meaning 'prior to the time that the government can undertake collection activities.'"  1979 WL 1430, at *3.  The taxpayers in that case had argued that the liquidations and transfers they made over a two-year period did not take place "quickly" and did not lead to a conclusion that they appeared to be "designing quickly" to place property beyond the government's reach.[14]  Id.  The court rejected that argument, stating that "[t]he purpose of the termination and jeopardy assessment statutes is to allow the government to protect its interests where the collection of taxes may be rendered ineffective or jeopardized to some degree if collection efforts are delayed during the standard pre-assessment and pre-collection administrative or judicial review."  Id.  The court believed that without a jeopardy assessment against the taxpayers, they could "easily conceal, transfer, or dispose of all their known remaining property" prior to the government beginning collection activities, because the government would have to wait for the Tax Court to render judgment.  Id.

A handful of courts have relied on the French court's understanding of "quickly."  In DeLauri v. United States, the taxpayer subject to a jeopardy assessment had transferred assets in the following manner:  IRS agents first contacted the taxpayer in February 1976 and informed him that his personal tax returns and the tax returns for his wholly-owned corporation for a period of three years were the subjects of a criminal investigation.  492 F. Supp. at 445.  At that

---

[14] As discussed above, in French, the taxpayers had liquidated $1 million in assets, closed sizeable savings accounts and all checking accounts known to the government, disposed of several thousand shares of valuable stock and $400,000 worth of tax-free bonds, transferred all their real property to their children or through their children to a friend, and transferred substantially valuable contractual rights to receive installment payments to the same friend. 1979 WL 1430, at *2.

time, the taxpayer owned five pieces of real property valued at approximately $375,000.  Id.  In March of 1977, the taxpayer sold one piece of real property.  Id.  Three months later, the taxpayer learned that criminal prosecution would be recommended.  Id.  In July of 1977, he sold one-half of a second piece of property.  Id.  In early 1978, the taxpayer learned that his case had been forwarded to the Department of Justice for prosecution.  Id.  Within four months after his case was referred to the Department of Justice, the taxpayer sold a third piece of property, and on the first day of his trial in November 1979, he sold the remaining one-half of the property he originally sold in July 1977.  Id.  The taxpayer was convicted in December 1979, and in February 1980, the IRS learned that the taxpayer was looking for a buyer for the fourth piece of property and was also attempting to sell his home, the fifth piece of property.  Id.  Also in February 1980, an IRS agent discovered an advertisement for the sale of shops owned by the taxpayer's other corporation.  Id.  The court found that the "transfers of property already accomplished, and any possible future transfers of the remaining property, could seriously jeopardize the collection of any taxes found owing in a civil proceeding."  Id. at 446.  The court also noted, however, that "there is some doubt as to the 'quickness' with which the taxpayer had designed to transfer his property," but that in light of the "significant evidence" of activity designed to place the taxpayer's property beyond the reach of the government, the jeopardy assessment was reasonable.  Id. (citing French, 1979 WL 1430, at *3).

In Felkel v. United States, the court "noted with approval" the French court's conclusion that the meaning of "quickly" was tied to the amount of time it would take for the Tax Court to render a final decision and begin collection of the taxes allegedly owed, rather than the quickness with which a taxpayer is planning to or is placing property beyond the reach of the government.  Felkel v. U.S., 570 F. Supp. 833, 839 (D.S.C. 1983) (citing French, 1979 WL 1430,

at *3).  The court found the jeopardy assessment reasonable because the taxpayer put assets and substantial real estate holdings in the names of nominee corporations rather than his own, used alter ego corporations to hide from creditors, made numerous quick transfers between alter ego corporations, failed to keep or maintain adequate and accurate records, failed to file corporate returns and failed to report appreciable income on personal returns, engaged in an apparent illegal "skimming operation," dealt primarily in cash, made false financial statements, had a history of nonpayment of taxes, and made purchases in the names of other individuals.  Id. at 838–41.  The government was ultimately unable to trace or find the amounts realized from the sale of several hundred parcels of real estate between 1974 and 1981 that were carried out by the taxpayer's alter ego corporations.  Id. at 836.  The court found that "the [taxpayer] has shown an ability to create new corporations and quickly transfer assets to and from these corporations" and noted that not only had the taxpayer utilized "a nonsensical scheme of transactions whereby one corporation would transfer a parcel of property to another corporation only to have it transferred back in several cases," he had actually admitted to a revenue officer that he had done so to avoid lien creditors.  Id. (noting that it took the government over 3,000 hours to track down seventy-five of the taxpayer's alter ego corporations and that another twenty-five corporations remained unfound, and finding that "[the taxpayer's] ability to conceal assets in these corporations clearly creates jeopardy").

Finally, in Harvey v. United States, the court cited with approval the French court's discussion of the meaning of "quickly" in the jeopardy assessment context.  730 F. Supp. 1097, 1107 (S.D. Fla. 1990).  In that case the taxpayer, who had "a history of involvement in large-scale drug smuggling," held personal assets in the names of corporations, held real estate including his personal residence in the name of a corporation, had used at least one alias, and

maintained funds in foreign bank accounts.  Id. at 1100–01.  Approximately one month after the

taxpayer learned he was the target of a grand jury investigation and received subpoenas

requesting records of various corporate accounts, he transferred over $3 million out of his bank

accounts in the Cayman Islands.  Id. at 1101.  In addition, the taxpayer, who was aware of an

IRS levy on another of his bank accounts, attempted through an agent to withdraw funds from

that account while the jeopardy review action was pending.  Id.  The court found that those

transfers and the attempted transfers "demonstrate[d] that the use of standard collection

procedures against the Plaintiff would be futile."  Id. at 1107 (finding the jeopardy assessment

reasonable based on those facts and also the taxpayer's use of nominee or shell corporations).


        While these rulings provide some guidance, the Court remains cognizant that the review

of each jeopardy assessment case is fact-specific.  The timing of a taxpayer's transfer of assets

relative to an investigation or a court proceeding, as well as the rapidity with which a taxpayer

transfers those assets, are important factors for a court's analysis of whether a taxpayer is

"designing quickly" to hide or remove property and therefore whether the jeopardy assessment is

reasonable.  Those factors should be considered along with whether the taxpayer is or appears to

be "dealing with his assets in such a manner that they will be placed beyond the reach of the

IRS."  See DeLauri, 492 F. Supp. at 445–446 ("While there is some doubt as to the 'quickness'

with which the taxpayer had designed to transfer his property, there is significant evidence of

such activity even in the more recent transactions.")  The Court is also mindful of the fact that

"[a]n assessment under section 6861 is 'an extraordinary measure, intended for exigent

circumstances (hence the name 'jeopardy assessment').'"  Modern Bookkeeping, 854 F. Supp. at

476 (quoting Penner v. U.S., 582 F. Supp. 432, 434 (S.D. Fla. 1984)).

The overarching purpose of making a jeopardy assessment at all is to give the IRS a means of preserving the status quo with respect to a taxpayer's assets in cases where the IRS needs to ensure that those assets remain prior to the time that the government can undertake collection activities—hence, some courts' use of the phrase "exigent circumstances" to describe situations in which a jeopardy assessment is appropriate.  For that reason, the French court's definition of "quickly" reads too broadly.  One of the three situations in which it is reasonable for the IRS to make a jeopardy assessment is where a taxpayer is or appears to be "designing quickly" to place assets beyond the reach of the government.  See 26 C.F.R. 1.6851–1(a)(1)(ii).  Interpreting "designing quickly" to mean "prior to the time that the government can undertake collection activities," 1979 WL 1430, at *3, overlooks the fact that the Treasury Department wrote the regulation such that the adverb "quickly" modifies the verb "designing."  The Regulation's inclusion of the phrase "designing quickly" means, therefore, that the jeopardy assessment is intended to be used where the taxpayer's efforts or plans to place assets beyond the reach of the government are actually occurring quickly.  A broader interpretation would render the modifier "quickly" superfluous.

In any event, the facts unique to Plaintiff's case are distinguishable from those of French and its progeny.  First, unlike in French, Plaintiff's transferred properties are held jointly by Plaintiff and Plaintiff's fiancée and by Plaintiff and his son, and accordingly are not beyond the reach of the government.  Second, unlike in DeLauri, Plaintiff's real estate sale and transfers of his other properties were not taking place quickly.  They occurred over a period of years, and it does not appear that they were accomplished in response to the various phases of the government's investigation.  One of the transfers the IRS complains of occurred before Plaintiff learned in 2009 that the IRS would be investigating him, and all of them occurred before

Plaintiff was finally told in October 2012 that he would be assessed with additional income taxes, and before Plaintiff learned the IRS would also seek additional gift and excise taxes. Third, with respect to post-assessment events, unlike in Harvey, Defendant has not submitted any evidence that Plaintiff made or attempted to make additional real estate transfers or liquidate assets in the time since the IRS made the jeopardy assessment against Plaintiff.  Fourth, unlike in Felkel, Plaintiff's monetary and real estate transfers were easily traced by Defendant using only public records and information provided to the IRS, and the IRS was able to determine the amount of sale proceeds from the property Plaintiff sold and to whom the proceeds went. Plaintiff's actions with respect to his real property and financial accounts, unlike that of the taxpayers in French and similar cases discussed above, was not that of someone "designing quickly" to place property beyond the reach of the government as those courts understood the term.

An additional factor the Court has considered in determining whether Plaintiff is "designing quickly" to hide or remove assets from the government's reach is the length of time between the start of the IRS investigation and the point at which the IRS actually noticed a jeopardy assessment.  Here, the IRS began investigating Plaintiff in 2009 and noticed a jeopardy assessment in 2012—a timespan of more than three years.[15]  Plaintiff first sold real property in 2008, after he was indicted but prior being notified of the IRS investigation.  While all of Plaintiff's real estate and cash transfers occurred either after he was indicted or after his criminal trial began, Plaintiff paid restitution, fines, and special assessments totaling $2,765,539.46 within

---

[15] As Agent Kelly noted in his declaration, he took time off during the examination to deal with serious family issues.  The Court is sympathetic to Agent Kelly's situation.  However, had the IRS viewed Plaintiff's case as one where urgent review or a jeopardy assessment was necessary, it seems likely that another agent would have been assigned to take over the review of Plaintiff's case during Agent Kelly's absence, which does not appear to have been the case here.

several months after learning his original sentence.  Then, in November 2011, well after Plaintiff learned that the IRS was investigating him, Plaintiff was resentenced and ordered to pay approximately $1.1 million in additional restitution, which Plaintiff paid within several months. Several of the real estate transfers and cash transfers on which the IRS relies in support of the jeopardy assessment had already occurred by then, yet Plaintiff still fulfilled his restitution obligations in a timely manner.

In addition to considering the timing of Plaintiff's actions relative to his conviction and the IRS investigation of his affairs, the Court must consider the timing of the IRS's actions in response to those of Plaintiff.  Subsequent to a multi-year IRS investigation,[16] Plaintiff was notified that he was being assessed with additional income taxes for tax years 2001 to 2005 totaling more than $2 million.  However, at that time, the IRS believed no jeopardy assessment was needed.  (Def.'s Answer ¶ 28.)  Several months later, despite *no new activity* on Plaintiff's part, the IRS determined that a jeopardy assessment was needed based on the actions Plaintiff had already taken over a period of years.  In reviewing the timeline of the IRS investigation, Plaintiff's actions, Defendant's admission that in October 2012 no jeopardy assessment was needed, and the absence of any suspicious activity between October 2012 and the March 2013

---

[16]Certainly, the IRS has the ability to act quickly when necessary.  The timeline in <u>Wolckenhauer v. United States</u> stands in stark contrast to the timeline in Plaintiff's case.  There, the IRS noticed a jeopardy assessment less than three weeks after an agent was assigned to investigate the taxpayer in that case.  <u>Wolckenhauer v. U.S.</u>, No. Civ.A. 95-2798, 1996 WL 303146, at *2–3 (D.N.J. Mar. 26, 1996).  The court relied on an IRS agent's determinations that the taxpayer "had substantially mortgaged previously unencumbered properties after learning of the government's investigation and that the [taxpayer] was engaging, or had engaged, in other activities, i.e., loans to his corporations and the proposed liquidation of his pension [in the amount of $300,000]," to find the jeopardy assessment reasonable.  <u>Id.</u> at *2, *4.  Unlike the taxpayer in <u>Wolckenhauer</u>, whose actions appeared to be calculated and taken in response to an IRS investigation, Plaintiff's actions were undertaken in part to fulfill his financial obligations to the government as a result of his conviction and to manage his affairs during his incarceration, as discussed previously, and in part in response to changing tax exemptions affecting his real property assets which are discussed more fully below.

jeopardy assessment, the Court is hard-pressed to find that Plaintiff was designing "quickly" to transfer real estate or money to his son and to his fiancée.

As Defendant bears the burden of proof on whether the making of the jeopardy assessment was reasonable, the Court cannot ignore the substantial amount of time between the start of the IRS investigation and the date on which the IRS finally made the jeopardy assessment against Plaintiff.  Nor can the Court ignore Defendant's admission that at the time it assessed Plaintiff with more than $2 million in additional income taxes in October 2012 the IRS did not believe a jeopardy assessment against Plaintiff was necessary.  Those factors, coupled with an analysis of Plaintiff's activities between 2009 when the IRS investigation began and March 2013 when the jeopardy assessment was made, do not lead to a conclusion that Plaintiff was or appeared to be "designing quickly" to place assets beyond the government's reach. Given the extraordinary nature of a jeopardy assessment, the Court cannot find that the jeopardy assessment was reasonable on that ground.

c.   Placing Property Beyond the Reach of the Government

The third element relevant to analyzing the reasonableness of the jeopardy assessment is whether Plaintiff placed property beyond the reach of the government, leaving inadequate or no property or other assets for collection by the government after determinations in the Tax Court, unless immediate collection is undertaken.  See, e.g., French, 1979 WL 1430, at *2, *4 (finding a jeopardy assessment reasonable because it reasonably appeared that the taxpayers were attempting to place their property beyond the reach of the government, triggering the government's statutory right to make a jeopardy assessment).

For example, in <u>Barry v. United States</u>, the court found that a termination assessment[17] was reasonable where a taxpayer had placed real property beyond the reach of government attachment by having his wife hold his residence in an irrevocable trust for their children. 534 F. Supp. at 309. The taxpayer had no other property aside from an automobile which would secure the government's ability to collect taxes and he was converting large sums of money into precious metals which could be easily concealed and are not readily subject to attachment for purposes of securing payments of tax liability. <u>Id.</u>

Similarly, in <u>United States v. Grello</u>, the court found a jeopardy assessment reasonable where the taxpayer and his wife refinanced their house, after which the taxpayer sold his interest in the house for $1.00. <u>Grello</u>, Docket No. Civ.A. 07-6123, 2010 WL 4181059, at *2 (D.N.J. Oct. 20, 2010). The taxpayer claimed that he sold his interest in the house to his wife for estate planning purposes on the advice of an attorney, even though the taxpayer and his wife already owned the house as tenants by the entirety pursuant to New Jersey law. <u>Id.</u> The court concluded that the jeopardy assessment against that taxpayer was reasonable, in part because the circumstances surrounding the house transfer raised jeopardy concerns and because the taxpayer did not provide any valid legal reason for the sale. <u>Id.</u> at *7, *9. The court went on to find that the house transfer was a fraudulent conveyance, because although the house was valued at $700,000.00 the conveyance was in exchange for only $1.00, and because the taxpayer did not need to transfer the house to his wife in order for her to inherit because she already had an undivided one-half interest with a right of survivorship in the property and would have inherited the property upon her husband's death. <u>Id.</u> at *8–9.

---

[17] Courts have generally analyzed factors supporting termination and jeopardy assessments in the same manner. <u>See, e.g.</u>, <u>French</u>, 1979 WL 1430, at *3–4 (describing the common purpose and process of making termination and jeopardy assessments).

Unlike the taxpayer in <u>Grello</u>, Plaintiff's son and fiancée would not necessarily have inherited their interests in Plaintiff's real estate in the absence of the transfers, and Plaintiff has provided valid legal reasons for the transfers of interest in real estate to his son and fiancée. Plaintiff maintains that he made certain real estate transfers as a means of estate planning recommended by his accountant in light of the impending expiration of the so-called "Bush tax cuts." Defendant contests Plaintiff's motives for the transfers, but does not dispute that such estate planning methods, if proven to be true, would be lawful. <u>Cf.</u> <u>Modern Bookkeeping</u>, 854 F. Supp. at 478–79 (noting that while the government believed the taxpayer's use of an offshore fire and casualty company was evidence that the taxpayer was placing assets beyond the reach of the government, a former IRS agent testified that doing so is a commonly recognized, lawful business practice). More importantly, the transfers of partial interests in the properties have not placed Plaintiff's real estate assets beyond the reach of the government—they have only altered the potential means of collection Defendant could utilize.

With regard to Plaintiff's transferred interests in real estate, Defendant knows the identities of the two people to whom he transferred real property—Plaintiff's son and Plaintiff's fiancée. In fact, Defendant has already filed a nominee lien against Plaintiff's fiancée. Plaintiff did not transfer real estate interests to alter ego or shell corporations, or parties unknown to Defendant who might be difficult to locate. Furthermore, and as stated previously, Defendant was able to trace Plaintiff's real property transfers using only public databases and public records to carry out a "somewhat limited" search. (Lewis Decl. ¶ 10 n.1.) Moreover, Plaintiff still retains an interest in most of the properties in question.

Defendant also argues that Plaintiff, a man in his seventies with a history of health problems, could die before the assessed taxes could be collected, assuming they are ultimately found due

and owing, which would cause Plaintiff's son and fiancée to inherit the properties outright. (Def.'s Reply Br. Supp. Mot. Summ. J. 4.)  Many elderly taxpayers with a less than optimal medical history—indeed any taxpayer—could die before their taxes are collected, but a taxpayer's mortality is not a relevant factor in evaluating the reasonableness of a jeopardy assessment.  Any health issues Plaintiff may have cannot be deemed part of a plan to put assets beyond the reach of the government.

In addition to Plaintiff's real estate transfers, Defendant relies on Plaintiff's criminal conviction[18] and subsequent decrease in net worth, caused by substantial legal bills, criminal fines, and restitution payments, in support of its argument that "it clearly appears that the taxpayer was attempting to put his assets beyond the reach of the IRS."  (Def.'s Mem. Supp. Mot. Summ. J. 16.)  Specifically, Defendant notes that Plaintiff paid $3,435,548.00 in criminal restitution, as well as a $411,000.00 criminal fine; he borrowed $1.4 million from his family trust to help pay his restitution obligations; he incurred and continues to incur substantial attorney's fees; prior to 2010 he sold his life insurance policy and his investment properties; and in 2010 believed he would soon be "in financial jeopardy."  (Id. (internal citations omitted).)

While attorney's fees, criminal fines, and restitution payments resulting from his conviction have decreased Plaintiff's overall net worth, Plaintiff's necessary expenditures on attorney's fees

---

[18] Defendant argues that Plaintiff's 2009 criminal conviction alone is enough to find the 2013 jeopardy assessment reasonable.  (Def.'s Mem. Supp. Mot. Summ. J. 16 (citing Harvey, 730 F. Supp. at 1106 (A taxpayer's "involvement in illegal activity alone is sufficient to warrant the use of a termination or jeopardy assessment")).)  The Court agrees that prior illegal activity is a factor which could support finding a jeopardy assessment reasonable, but that factor without more is not adequate to show that a taxpayer is or appears to be designing quickly to place assets beyond the reach of the government.  The Court also notes that in Harvey, the taxpayer was convicted of conspiracy to impede and impair the functions of the Internal Revenue Service, and remained under indictment for tax evasion for the years 1978 through 1982, and for filing a false return for 1980.  Id. at 1107 (finding that "[t]his involvement with criminal tax violations alone justifies the making of the jeopardy assessments in this case").  Here, the jeopardy assessment narrative specifically states that "Fumo's conviction *did not* involve specific income tax crimes." (Def.'s Mot. Summ. J., App'x Ex. A (emphasis in original).)

for defense in his criminal prosecution and appeal, and whatever attorney's fees he has incurred or will incur as a result of proceedings in this Court and in the United States Tax Court related to his potential tax liabilities, are not evidence that Plaintiff is placing assets beyond the reach of the government.  "The payment of attorney fees . . . is expenditure in the ordinary course of business and cannot reasonably be understood as the type of dissipation for which the extraordinary measure of the jeopardy assessment was intended."  George F. Harding Museum, 674 F. Supp. at 1329.  Likewise, payments Plaintiff made to the United States for restitution and fines as a result of his criminal conviction, while perhaps decreasing his net worth and requiring him to sell assets, are not evidence showing that Plaintiff has placed assets beyond the reach of the government.[19]  Finally, some of the sale proceeds from the property Plaintiff sold outright were used to pay restitution of approximately $1 million to the United States, which undercuts any belief that Plaintiff used the sale to place that asset beyond the reach of the government.[20]  "Whenever the IRS determines that a taxpayer may owe additional taxes, that taxpayer's current assets may well be 'dissipated' to meet current expenses and 'transferred' to others who are actual, as distinguished from potential, creditors."  Id. at 1328.  As could potentially be the case with Plaintiff, a "taxpayer may well . . . be less able to respond to a subsequently determined tax liability, but that, certainly, is not the extraordinary situation Congress had in mind.  The IRS is

---

[19] Plaintiff makes a similar argument based on language in the Internal Revenue Manual, stating that "[t]o the extent a jeopardy assessment is justified because the 'taxpayer's financial solvency is or appears to be in peril,' this does not include situations where the taxpayer's potential insolvency results from the accrual of the proposed assessment of tax, interest, and penalties." (Pl.'s Mem. Supp. Cross Mot. Summ. J. 14 (citing I.R.M. 1.2.13.1.27).)

[20] Plaintiff mortgaged the Green Street property in order to secure a loan to pay court ordered restitution, which does not appear to have been part of an effort to place that property beyond the reach of the government, unlike in Wolckenhauer where the taxpayer's property appeared to have been mortgaged in an effort to place it beyond the reach of the government.  1996 WL 303146, at *2, *4.

here, after all, only a potential creditor.  Whether taxes are due is the issue before the Tax

Court."  Id.

Defendant further contends that Plaintiff made substantial cash gifts to his son as part of his

plan to place assets beyond the reach of the government.  Plaintiff credibly responds that, with

the assistance of his son, he transferred money into joint bank accounts as a means of managing

his finances immediately prior to and during his incarceration.  Plaintiff's son explained in his

declarations that certain funds were moved between accounts because some banks refused to

take Plaintiff's money or had unilaterally closed Plaintiff's accounts, he was trying to obtain

better interest rates for Plaintiff's money, and he mistakenly thought he could add Plaintiff to an

account as a joint account holder when he actually had to initially open an account as a joint

account.  Unlike the logistic solutions Plaintiff utilized for the management of his affairs prior to

serving and during his prison sentence, the jeopardy assessment statute in most cases

"contemplates the movements of property out of reach of the government by means of

underhanded maneuvering of funds into shell corporations or by the laundering of cash drawn

from illicit activity."  George F. Harding Museum, 674 F. Supp. at 1329.  In this case, Plaintiff

moved funds, or directed that funds be moved, in a transparent manner.  Indeed, the IRS was

able to trace the funds at issue,[21] and has not put forth evidence showing that other funds are

missing or were part of illegal activity.

In light of the foregoing, the Court does not find that Plaintiff's conduct with respect to his

real estate and financial transfers and expenditures was intended to place property beyond the

reach of the Government.

---

[21] The Declaration of IRS Lead Attorney Alice Diamond does not state when she was assigned to
review the "confidential information" the IRS received regarding Plaintiff's accounts, nor when
she was assigned to Plaintiff's case.  As such, the Court cannot determine how quickly the IRS
was able to trace the funds.

### d. Concealing, Transferring, or Dissipating Assets

As previously stated, a jeopardy assessment is appropriate where a taxpayer is or appears to be designing quickly to place property beyond the reach of the government, including by transferring, concealing, or dissipating it.  26 C.F.R 1.6851-1(a)(1)(ii).  Defendant argues that Plaintiff dissipated his remaining assets and significantly decreased his net worth by transferring money into his son's bank account, transferring a farm to his fiancée in exchange for $1.00 consideration, and by transferring two vacation homes to himself and his fiancée as joint tenants with a right of survivorship[22] and three other properties to himself and his son as joint tenants with a right of survivorship.  Defendant stated that "[a]s of March 2013, the IRS could not find any assets in the taxpayer's name, other than:  (1) his remaining interests in the New Jersey beach house, the Green Street Mansion, 6601 Monmouth, and the 13th Street property, (2) his retirement account, and (3) other bank accounts and operating accounts associated with the taxpayer."[23]  (Def.'s Mem. Supp. Mot. Summ. J. 16–17 (internal citations omitted).)  Defendant is also concerned that if Plaintiff dies, his interests in those properties will pass to his son and fiancée.[24]

As discussed above, pursuant to Power of Attorney, Plaintiff's son had control of Plaintiff's finances while Plaintiff was in prison, and the transfers of funds into Plaintiff's son's account appear to be part of Plaintiff's arrangements for the management of his financial obligations, not

---

[22] Defendant notes that Plaintiff's fiancée later sold the Florida vacation home and received more than $1 million from the sale.  (Def.'s Mem. Supp. Mot. Summ. J. 17 n.7.)  But it must also be noted that approximately $1.1 million from the sale was applied to Plaintiff's restitution obligations.

[23] Defendant notes in support of its argument that Plaintiff dissipated assets to avoid paying taxes, that Plaintiff has not disputed that his net worth has decreased, and that while Plaintiff "may assert that he has additional undisclosed assets," in light of "his admissions to his ex-wife, it is unlikely."  (Def.'s Mem. Supp. Mot. Summ. J. 18 n.8.)  The Court is not convinced by Defendant's assertion that it is unlikely that someone would be less than truthful about assets to an ex-spouse, particularly in light of the litigation concerning the Fumo family trust.

[24] (See Def.'s Reply Br. Supp. Mot. Summ. J. 4.)

a dissipation, transfer, or means of concealing assets.  Defendant avers that Plaintiff "gave up dominion and control over the $920,000 when it was deposited in his son's bank account, because (as he does not dispute), the taxpayer could not walk into the bank and direct the bank to transfer or preserve the funds in the account, or pledge the account as collateral, or withdraw the money from the account for his own use."  (Def.'s Reply Br. Supp. Mot. Summ. J. 17.)  During the time Plaintiff's son had Power of Attorney over his finances that was technically true, but only because Plaintiff was incarcerated in federal prison—not because he gave up control of his money by virtue of making an alleged gift.  Defendant argues further that Plaintiff has offered "no objective evidence" that he retained control over the funds after they were transferred into his son's account, but again, Plaintiff was incarcerated, thus necessitating that his son manage his affairs.  Defendant argues that Plaintiff could only control the money by giving instructions to his son, and that "[t]he fact that his son may have chosen [to] follow his father's instructions does not render the gift tax assessment inappropriate."  (Id.)  Even so, for purposes of evaluating the reasonableness of the jeopardy assessment, rather than the appropriateness of the amount, it is illustrative that Plaintiff's son actually did follow Plaintiff's instructions regarding the use of the transferred funds, lending credence to Plaintiff's assertions that the transfers were for the purpose of managing his affairs during his incarceration, rather than a dissipation of assets through a monetary gift.

Furthermore, evidence before the Court regarding Plaintiff's assets shows that Plaintiff retains an interest in four valuable properties and, though the IRS has levied them, has accounts in his name with a combined total of over $2.7 million.  (Lewis Decl. ¶ 24.)  It is therefore curious that Defendant asserts that collection is in jeopardy because the IRS was unable to locate assets belonging to Plaintiff "other than" the above-listed assets.  Defendant also argues that

Plaintiff's letters "confirm that he has few remaining assets available to pay his outstanding tax debts." (Def.'s Mem. Supp. Mot. Summ. J. 8.)  However, even without the value of Plaintiff's real estate interests, the amount of money in Plaintiff's bank accounts alone is sufficient to pay the assessed taxes if the Tax Court ultimately finds them due and owing.  Even if Plaintiff's sale of his $1 million policy and "almost all of [his] investment real estate" were needed to pay his legal bills, and even if he felt "broke" and "in financial jeopardy" compared with his prior state of wealth, he was not then and is not now actually broke.  (Def.'s Mem. Supp. Mot. Summ. J. App'x Ex. S, Pl.'s Ltr., Sept. 17, 2010.)  More importantly, as noted above, selling assets to pay legal bills does not show dissipation of assets.  See George F. Harding Museum, 674 F. Supp. at 1328–29.

Regarding the real estate transfers, as discussed above, Plaintiff retains an interest in the properties and transferred them either jointly to himself and his son or jointly to himself and his fiancée on the estate planning advice of an accountant.  As the properties are now owned jointly by Plaintiff and his son and Plaintiff and his fiancée, the transfers did not place the properties beyond the reach of the government.  With respect to the properties that Plaintiff mortgaged or sold, Plaintiff maintains that he did so in order to secure a loan to pay his restitution obligations and in order to begin making payments on those restitution obligations.

Defendant again asserts that Plaintiff's explanations are belied by the statements to his ex-wife in letters he wrote to her from prison in 2010, and that those "admissions confirm that he had a plan to hide assets from all his creditors, including the IRS." (Def.'s Mem. Supp. Mot. Summ. J. 18.)  But regardless of how Plaintiff felt about his situation in 2010, and regardless of whether he contemplated avoiding vulnerability to the government and creditors, the evidence submitted by Defendant demonstrates that Plaintiff has not actually dissipated or hidden his

assets.  Cf. Burd, 774 F. Supp. at 907 ("[E]ven if the plaintiff knew that she was required to report as income the corporation's payments of her personal expenses and failed to do so, and even if this may reveal her intention to misrepresent her income and avoid paying taxes, this does not provide the IRS with the justification for a jeopardy assessment.").  The IRS was able to trace every real estate transfer and sale and every monetary transfer between and among Plaintiff's and Plaintiff's son's bank accounts and documented them in great detail in the declarations supporting the jeopardy assessment.  Defendant has not argued nor submitted evidence to show that Plaintiff's money and properties were untraceable or unaccounted for. Other than the farm he transferred to his fiancée, Plaintiff retains an ownership interest in the real estate properties transferred to his son and to his fiancée.  Accordingly, Plaintiff has not liquidated or dissipated those real property assets.

Finally, Defendant contends that the potential for dissipation of assets is a factor for the Court's consideration, and cites White v. United States for the proposition that "[i]n other words, it is sufficient for the Government to show that the taxpayer's remaining assets could easily be dissipated."  754 F. Supp. 66 (M.D.N.C. 1991).[25]  However, "the expressed language of Congress which established standards for determining when a jeopardy assessment is appropriate," id. at 68, signals to the Court that the necessary showing requires more than a showing that a taxpayer's assets *could* easily be dissipated.  It requires, in this case, a showing that "[t]he taxpayer is or appears to be designing quickly to place his property beyond the reach of the Government either by removing it from the United States, or by concealing it, or by transferring it to other persons, or by dissipating it."  Id. at 68 (citing Joint Committee on

---

[25] The Court must note that the quoted language, which appears on page eight of the Defendant's Reply Brief, does not actually appear in the cited case.  As Defendant did not include a pincite for the quotation used, and the Court has been unable to locate the language as quoted in White v. United States, the Court can only conclude that Defendant has inadvertently cited the incorrect case.

Taxation, General Explanation of the Tax Reform Act of 1976, H.R. Rep. No. 10612, 94th Cong., 2d Sess. 361 n.7 (1976)).  Any taxpayer could easily dissipate their assets, but that would not justify finding a jeopardy assessment reasonable without also finding that the applicable standards were met.

In light of the foregoing, the Court does not find that Plaintiff has placed property beyond of the reach of the government by dissipating assets.

### e.   Conclusion as to Reasonableness of the Jeopardy Assessment

The Court is ultimately tasked with determining whether the jeopardy assessment against Plaintiff is reasonable under the circumstances.  26 U.S.C. § 7429(b)(3)(A)(i).  Defendant urges the Court to consider the following factors to determine whether the jeopardy assessment was reasonable in light of its assertion that Plaintiff was designing quickly to place assets beyond the reach of the government:  (1) whether the taxpayer possesses, or deals in, large amounts of cash; (2) whether prior tax returns report little or no income despite possession of large amounts of cash; (3) whether assets have been dissipated through forfeiture, expenditures for attorney's fees, or appearance bonds; (4) whether there is a lack of assets from which potential tax liability can be collected; (5) whether the taxpayer has used aliases that make it more difficult to locate either the taxpayer or his assets; (6) whether the taxpayer has failed to supply appropriate financial information; and (7) whether the taxpayer has used multiple addresses, making it hard to find the taxpayer.  (Def.'s Mem. Supp. Mot. Summ. J. 15 (citing Magluta, 952 F. Supp. at 801–02).) [26] Of the seven factors listed in Magluta, therefore, only the third and fourth factors potentially apply to Plaintiff.[27]

---

[26] Another factor set forth by Defendant is whether the taxpayer is involved in illegal activity, but although Plaintiff was involved in illegal activity prior to his conviction in 2009, no evidence has been submitted to show that he is currently involved in illegal activity.  (Def.'s Mem. Supp. Mot. Summ. J. 15 (citing Magluta, 952 F. Supp. at 801–02).)

[27] The first and second factors do not apply, because no evidence has been provided to show that Plaintiff deals in large amounts of cash.  The fifth factor does not apply because no evidence has

With regard to the third factor, all of the real estate transfers and cash transfers now in question occurred prior to the IRS's notification to Plaintiff that it believed he owed additional income taxes of over $2 million.  The Court finds it significant that when the IRS notified Plaintiff on October 3, 2012 that there were proposed adjustments to his income tax liability totaling more than $2 million, the IRS did not also make a jeopardy assessment.  The IRS admitted that it did not believe the jeopardy assessment was necessary as of October 3, 2012. (Def.'s Answer ¶ 28.)  The same factors on which the IRS relies in support of the jeopardy assessment made in March 2013 were present in October 2012 when the assessment was believed unnecessary—specifically, Plaintiff's "past criminal conduct, [alleged] dissipation of assets, and transfers of large amounts of property."  (Def.'s Mem. Supp. Mot. Summ. J. 19.)  The same is true of the "badges of fraud" Defendant attributes to Plaintiff.[28]

With regard to the fourth factor regarding assets, or a lack thereof, from which potential tax liability can be collected, Plaintiff is still a wealthy individual under any reasonable standard. Plaintiff's future job prospects and earnings may be limited, but Plaintiff retains legal interest in

---

been provided to show that Plaintiff has used aliases.  The sixth factor does not apply, because although Defendant alleges that Plaintiff has failed to file his taxes appropriately, evidence has not been provided to show that Plaintiff has failed to supply appropriate financial information. The seventh factor does not apply, because although Plaintiff owns an interest in multiple pieces of real property, his residence and his other properties are known to the IRS and, until recently, he was resident in federal prison or under home confinement.  Finally, aside from the allegations set forth in support of the jeopardy assessment, Defendant has not alleged that Plaintiff is currently involved in illegal activity.  Defendant also argued that additional factors weigh in favor of a jeopardy assessment against Plaintiff, including the fact that Plaintiff lost his license to practice law and that at the time of the investigation, Plaintiff was in prison.  (Def.'s Mem. Supp. Mot. Summ. J. 6.)  However, an inability to practice law and service of a prison sentence are not factors which necessarily support a finding that a taxpayer is or appears to be designing quickly to place property beyond the reach of the government.

[28] Defendant argues that the following "badges of fraud" support the IRS's conclusions:  Plaintiff is a sophisticated attorney; Plaintiff was convicted of conspiracy, fraud, obstruction of justice, and other crimes; Plaintiff omitted income on his tax returns over several years; Plaintiff understated his income tax liability for a number of years; Plaintiff did not keep adequate records of his income; and Plaintiff solicited staff at Citizens Alliance to destroy emails and "wipe" computers.  (Def.'s Mem. Supp. Mot. Summ. J. 21–22.)

several valuable properties and has nearly $2.8 million in his bank accounts (Lewis Decl. ¶ 24.) Prior to making a formal tax assessment against Plaintiff, the IRS was unable to serve summonses on the banks where Plaintiff had accounts, but Defendant now knows that there are substantial funds in Plaintiff's accounts.

More generally, other than stating that it learned through a newspaper article that Plaintiff had transferred real estate in a transparent manner over a period of several years, Defendant has not explained what events occurred, or what actions Plaintiff took, between October 3, 2012 and March 21, 2013 that caused Defendant to so alter its position regarding whether collection from Plaintiff was jeopardized at all, or why collection was not jeopardized when the amount sought was $2 million but was jeopardized when the amount increased by a little over $1 million. Defendant admitted that as of October 3, 2012, no jeopardy assessment against Plaintiff was necessary, even while "sources" were telling the Philadelphia Inquirer that the IRS was looking at having Plaintiff assessed with additional taxes stemming from the fraud convictions. As of October 3, 2012, Plaintiff had not been notified of any additional excise taxes, even though the evidence on which Defendant now relies was in the same transcripts that Agent Kelly had been reviewing for three years and which led Agent Kelly to assess Plaintiff with additional income taxes but no additional excise taxes as of October 3, 2012. Agent Roton met with Citizens Alliance in July 2009, yet no excise taxes were assessed until more than three years later.

While the "age of the evidence" Defendant relied on in making its jeopardy assessment would not prevent a finding that the jeopardy assessment against Plaintiff was reasonable, it is a factor for the Court's consideration, particularly in light of the Defendant's admission that as of October 3, 2012 the IRS did not believe a jeopardy assessment against Plaintiff was necessary to

preserve the IRS's ability to potentially collect over $2 million from Plaintiff.  This was so, even though as of 2009 the IRS had been provided with confidential information and was aware that Plaintiff had transferred substantial amounts of money to his son's accounts and other joint accounts.

Defendant argues that without a jeopardy assessment, it could be forced to wait several years before starting to collect from Plaintiff what is now with interest $3,359,245.00 in claimed tax liability.  (Def.'s Mem. Supp. Mot. Summ. J. 17.)  It is true that in the absence of a jeopardy assessment the IRS will have to follow normal tax collection procedures and will have to wait until the conclusion of proceedings in Tax Court to know whether it is entitled to the additional taxes, and if it is, to collect them from Plaintiff.  However, having to follow normal tax collection procedures, in the absence of a showing that Plaintiff is or appears to be designing quickly to place his assets beyond the reach of the government, is not enough to render a jeopardy assessment reasonable.  As Plaintiff argues, "[t]he ultimate question to be determined by this Court is whether there exists a factual basis to allow the Internal Revenue Service to avoid the natural risks of delay in collecting taxes (which may never be due) before the liability is fairly determined."  (Pl.'s Sur-Reply Opp. Def.'s Mot. Summ. J. 3.)  Having found that Defendant has not shown that Plaintiff is or appears to be designing quickly to place property beyond the reach of the government, that factual basis is lacking and the Court finds that the making of the jeopardy assessment against Plaintiff was unreasonable.

The Court must briefly address Plaintiff's argument that the assessment of additional taxes and the making of the jeopardy assessment were retaliation for Plaintiff having exercised his constitutional right to a trial and because Defendant was dissatisfied with the sentence Plaintiff received for his criminal conviction.  Plaintiff asserts that he is in possession of e-mails

between IRS and Department of Justice ("DOJ") officials which caused Plaintiff to believe that the DOJ officials who prosecuted Plaintiff may have inappropriately influenced, or may have attempted to inappropriately influence, the IRS.  (Compl. ¶ 45.)  Defendant admitted that the IRS communicated with DOJ attorneys, but denies Plaintiff's allegations that the DOJ attorneys involved in prosecuting Plaintiff played a role in the IRS's decision to make a jeopardy assessment against him.  (Def.'s Answer ¶ 45.)  Defendant maintains that "the IRS made [the decision to make a jeopardy assessment] after Plaintiff transferred substantial assets to his fiancée and to his family members, for little to no compensation," (id.), even though those transfers had already occurred by the time the IRS noticed Defendant with additional income tax liabilities of approximately $2 million, at a time when the IRS admitted it did not think the jeopardy assessment process was necessary.  (Id. ¶ 28.)  The Court has not been presented with evidence that proves Plaintiff's assertions, and the Court's finding that the jeopardy assessment against Plaintiff is unreasonable is not an indication of agreement with Plaintiff's claim that Defendant is retaliating against him through these tax and jeopardy assessments.  Rather, the Court's finding of unreasonableness simply recognizes the fact that "the jeopardy assessment procedure is an exception to the normally accepted method of assessment and collection of taxes," the use of which is not reasonable under these circumstances.

### 1.   Appropriateness of the Amount Assessed

Having found the jeopardy assessment unreasonable, the Court will not evaluate whether the amounts assessed were appropriate.[29]  See Modern Bookkeeping, 854 F. Supp. at 480

---

[29] Having found the jeopardy assessment unreasonable, the Court will not address Plaintiff's argument that Defendant is collaterally estopped from arguing that Plaintiff owes additional income taxes for the 2001 to 2005 tax years.

("Because the court finds that the assessment was not reasonable, it need not reach the issue of whether the amount of the assessment was reasonable.")  Plaintiff may or may not owe some or all of the additional tax liabilities the IRS seeks to recover from him, but that is a matter for the Tax Court.

IV.     CONCLUSION

    Having heard the arguments of counsel and having reviewed the briefs and pleadings and their exhibits, the Court finds that Defendant has not met its burden of proof with respect to the reasonableness of the jeopardy assessment against Plaintiff.  Accordingly, the Court finds, pursuant to 26 U.S.C. § 7429(b), that the making of the assessment is not reasonable under the circumstances.  Accordingly, the Court shall deny Defendant's Motion for Summary Judgment and grant Plaintiff's Motion for Summary Judgment.   This Court's ruling regarding the jeopardy assessment has no bearing whatsoever on any ultimate tax liability of Plaintiff with respect to the amounts noticed by Defendant.

    An appropriate Order follows.